ON REHEARING EN BANC

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 13-1473**

———————————

REYA C. BOYER-LIBERTO,

        Plaintiff – Appellant,

    v.

FONTAINEBLEAU CORPORATION, trading as Clarion Resort Fontainebleau Hotel; LEONARD P. BERGER,

        Defendants – Appellees.

--------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; METROPOLITAN WASHINGTON EMPLOYMENT LAWYERS ASSOCIATION; PUBLIC JUSTICE CENTER, INC.,

        Amici Supporting Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore.    James K. Bredar, District Judge. (1:12-cv-00212-JKB)

———————————

Argued: September 18, 2014          Decided: May 7, 2015

———————————

Before TRAXLER, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, GREGORY, SHEDD, DUNCAN, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges.

———————————

Vacated and remanded by published opinion.  Judge King wrote the majority opinion, in which Chief Judge Traxler and Judges Motz,

Gregory, Shedd, Duncan, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris joined. Judge Wilkinson wrote an opinion concurring in part and dissenting in part, in which Judge Agee joined. Judge Niemeyer wrote a dissenting opinion.

———————————

**ARGUED:** Robin Ringgold Cockey, COCKEY, BRENNAN & MALONEY, PC, Salisbury, Maryland, for Appellant. Harriet Ellen Cooperman, SAUL EWING LLP, Baltimore, Maryland, for Appellees. Paul D. Ramshaw, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus U.S. Equal Employment Opportunity Commission. **ON BRIEF:** Brett S. Covington, SAUL EWING LLP, Baltimore, Maryland, for Appellees. P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Jennifer S. Goldstein, Acting Assistant General Counsel, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus U.S. Equal Employment Opportunity Commission. Stephen Z. Chertkof, Douglas B. Huron, HELLER, HURON, CHERTKOF & SALZMAN PLLC, Washington, D.C.; Ilana Gelfman, Francis D. Murnaghan, Appellate Advocacy Fellow, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici Metropolitan Washington Employment Lawyers Association and the Public Justice Center.

———————————

KING, Circuit Judge:

Reya C. Boyer-Liberto, the African-American plaintiff in these civil rights proceedings, alleges that within a single twenty-four-hour period in September 2010, while working as a cocktail waitress at the Clarion Resort Fontainebleau Hotel in Ocean City, Maryland (the "Clarion"), she was twice called a "porch monkey" and threatened with the loss of her job by a Caucasian restaurant manager. Soon after reporting to higher-ups at the hotel that she had been racially harassed, Liberto was fired by the Clarion's owner, Dr. Leonard P. Berger. This action against the Fontainebleau Corporation and Berger ensued, with Liberto asserting claims of hostile work environment and retaliation, under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The district court awarded summary judgment to the defendants, see Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212 (D. Md. Apr. 5, 2013), ECF No. 52, and a not-fully-unanimous panel of this Court affirmed, see Boyer-Liberto v. Fontainebleau Corp., 752 F.3d 350 (4th Cir. 2014). The panel's decision was vacated, however, by our grant of rehearing en banc.

As explained below, we now vacate the judgment of the district court and remand for further proceedings on Liberto's claims. In so doing, we underscore the Supreme Court's pronouncement in Faragher v. City of Boca Raton, 524 U.S. 775,

3

788 (1998), that an isolated incident of harassment, if extremely serious, can create a hostile work environment. We also recognize that an employee is protected from retaliation when she reports an isolated incident of harassment that is physically threatening or humiliating, even if a hostile work environment is not engendered by that incident alone. Finally, we specify that, to the extent today's decision is in conflict with Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006), Jordan is hereby overruled.

I.

A.

The record in this matter reflects that on August 4, 2010, Liberto began working at the Clarion, an oceanfront hotel containing guest rooms, several restaurants and bars, a nightclub, and a conference center with meeting and banquet facilities.[1] During the seven weeks she was employed with the

---

[1] For purposes of our de novo assessment of the district court's summary judgment award, we view the facts in the light most favorable to Liberto, as the nonmoving party. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Thus, like the district court, we accept that Liberto was called a "porch monkey" on two consecutive days, and that the defendants knew of at least one of those alleged slurs when the decision to discharge Liberto was made. See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, slip op. at 3 n.2 (D. Md. Apr. 5, 2013), ECF No. 52. Much of our factual recitation is drawn from Liberto's deposition testimony; we do not rely on her
(Continued)

4

Clarion's Food and Beverage Department, Liberto worked in assorted roles, including restaurant hostess, restaurant and banquet server, bartender, and cocktail waitress. According to Liberto, the Clarion assigned her that variety of jobs so that she could learn all positions within the Food and Beverage Department as part of her training.

On the night of September 14, 2010, Liberto was working as a cocktail waitress in the Clarion's nightclub. One of her customers ordered a "Hula Hula," a drink that is time-consuming to prepare. The bartender in the adjacent main bar refused to fill the order, explaining to Liberto that other nightclub patrons would see the Hula Hula and want that drink, too. In an effort to please her customer and after consulting immediate supervisor Jamie Avery, Liberto went beyond the main bar to the pub bar, where she found a bartender willing to make a Hula Hula. Once the drink was prepared, Liberto wanted to avoid a confrontation with the bartender in the main bar, so she chose a new path back to the nightclub that took her through the restaurant kitchen. Liberto carried the Hula Hula briskly through the kitchen and across the nightclub to her customer's table. She then went to a server station, which was located in

interrogatory answers, which the district court properly excluded from consideration. See id.

5

the nightclub several feet from the kitchen doors, to print a guest check.

At that point, Liberto was confronted by Trudi Clubb, a white Food and Beverage Manager at the Clarion. Unbeknownst to Liberto, Clubb had been yelling at Liberto as she passed through the kitchen carrying the Hula Hula. Liberto soon learned that Clubb was livid because she believed that Liberto had heard but ignored her. As Liberto worked at the server station, Clubb came through the kitchen doors, loudly screaming, "Hey, girl that can't hear." J.A. 237.[2] Clubb, still shouting, quickly approached Liberto, who turned her face away from Clubb in an effort to remain calm — a move that made Clubb even more furious. Clubb then came so close to Liberto that Liberto could feel Clubb's breath on her face as Clubb stood at Liberto's side. Indeed, continuing to yell at Liberto, Clubb sprayed Liberto's face with saliva. Clubb's message was that Liberto should have neither walked through the kitchen nor ignored Clubb, and Liberto repeatedly indicated that she understood and agreed.

Clubb's shouting nonetheless persisted, even as Liberto left the server station to tend to nightclub customers. Clubb

---

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

was now loudly berating Liberto for walking away from her, at first following Liberto into the nightclub and then moving back to the server station. Upon Liberto's subsequent return to that area, Clubb finally proceeded to exit the nightclub into the kitchen. As she did so, Clubb threatened Liberto in words that included, "[I'm] going to get [you]" and "[I'm] going to make [you] sorry." J.A. 252-53. Clubb then concluded her threat by turning to look at Liberto and calling her either a "damn porch monkey" or a "dang porch monkey." See id. at 258.

Upon arriving for a dinner shift the following day, September 15, 2010, Liberto went to the Clarion's management office to report Clubb's conduct to Food and Beverage Director Richard Heubeck. Liberto had just begun talking to Heubeck when she was interrupted by Clubb, who came into the office and said to Liberto, "I need to speak to you, little girl." J.A. 263. Liberto responded that she was meeting with Heubeck, but Clubb retorted, "I'm more important," prompting Liberto to follow Clubb out of the office. Id. at 263-64. Clubb and Liberto sat at a nearby table, and Clubb reprimanded Liberto, in a raised and angry voice, for passing through the kitchen the prior night. As the two women then rose from the table and pushed in their chairs, Clubb threatened, "I'm gonna get you. I'm gonna go to [hotel owner] Dr. Berger." Id. at 266. Her voice still loud and angry though somewhat lower than before, Clubb capped

7

the threat by looking directly at Liberto and again calling her a "porch monkey." Id. at 266-68.

On September 16, 2010, Liberto arranged to speak with Human Resources Director Nancy Berghauer by telephone the following day. During the September 17 phone call, Liberto complained that she had been racially harassed by Clubb. From handwritten notes, Berghauer prepared a typewritten summary of her discussion with Liberto, which included Liberto's allegation that Clubb called her a "porch monkey" on September 15. Berghauer provided the summary on September 17 to Dr. Berger and General Manager Mark Elman, and Elman met with Liberto on September 18 to further discuss her complaint. Meanwhile, although Clubb denied ever using the term "porch monkey," Heubeck issued her a written notice on September 18 advising that, as "a member of our Food & Beverage Management team . . . , [Clubb] is expected to conduct herself as such" and "needs to be cautious the language or phrases she uses can not be perceived as racist or derogatory." J.A. 311.

According to Dr. Berger, Liberto's racial harassment complaint of September 17, 2010, prompted him to go to Heubeck that day and ask — for the first time ever — about Liberto's performance. In Berger's account, Heubeck gave a negative evaluation of Liberto and attributed her variety of job assignments to failure in every role she tried; thus, after

8

further consulting Elman and Berghauer between September 18 and 20, Berger made the decision to fire Liberto immediately. At the beginning of her scheduled shift on September 21, Liberto was notified that she was being discharged.

Whether Clubb had been empowered by the Clarion to fire Liberto or take other tangible employment actions against her is unclear on this record. From Liberto's perspective during her short time as a Clarion employee, Clubb "was just Dr. Berger's friend and she was just there to say hello and greet people as a glorified hostess." J.A. 213. Liberto did not know that Clubb held a manager title and did not consider Clubb to be her manager. See id. at 214 (Liberto's deposition testimony that she reported to Avery and Heubeck, and that Avery told Liberto "not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions"). Nevertheless, Clubb conveyed to Liberto — and Liberto got the message — that Clubb was in a position to have Liberto terminated. Before she had finished just her second week of work at the Clarion, Liberto "felt extremely singled out" by Clubb and perceived that "my position was being threatened" by her. See id. at 277-79 (discussing an August 16, 2010 Twitter message from Liberto to a co-worker saying that Clubb is "after me like [a] starving wol[f] on a bone"). Clubb repeatedly told Liberto "what my place was" and "always made it clear that Dr. Berger would listen to anything

9

she said and wouldn't believe me." Id. at 279. Clubb's conduct led Liberto to understand that Clubb "did have power that I did not have." Id. at 274. Consistent with that perception, Elman informed Liberto during their September 18, 2010 meeting that Clubb was Liberto's "boss." See id. at 324 (September 18 email to Heubeck and Berghauer from Elman recounting what he told Liberto).

## B.

On January 23, 2012, after exhausting her administrative remedies with the federal government's Equal Employment Opportunity Commission (the "EEOC"), Liberto filed her complaint in the District of Maryland. The complaint asserted four claims: one claim each of hostile work environment and retaliation pursuant to Title VII against solely the Fontainebleau Corporation, trading as the Clarion Resort Fontainebleau Hotel; and one claim each of hostile work environment and retaliation under 42 U.S.C. § 1981 against both the Fontainebleau Corporation and Dr. Berger.

## 1.

Following discovery, the defendants filed a motion for summary judgment. Contesting the validity of the hostile work environment claims, the defendants focused on just one of the four elements of such a claim, contending that there had been no showing that Clubb's conduct was severe or pervasive enough to

10

alter Liberto's conditions of employment and produce an abusive work environment.  See Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011) ("To demonstrate . . . a racially hostile work environment, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." (alteration and internal quotation marks omitted)); see also Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (explaining that the elements of a hostile work environment claim "are the same under either § 1981 or Title VII").

With respect to the retaliation claims, the defendants argued that Liberto could not establish that she undertook a protected activity by making her racial harassment complaint to the Clarion.  See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005) ("In order to establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events."); see also Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004) (recognizing that elements of prima facie § 1981 and Title VII retaliation claims are identical).  The defendants

11

elaborated that Liberto's complaint was not a protected opposition activity because she could not reasonably have believed that Clubb's conduct was sufficiently severe or pervasive to engender a prohibited hostile work environment. See Navy Fed., 424 F.3d at 406 (explaining that an opposition activity, such as making an internal complaint, is protected where an employee opposes either "employment actions actually unlawful under Title VII" or "employment actions [she] reasonably believes to be unlawful").

2.

In seeking summary judgment, the defendants substantially relied on our precedent in Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006). There, the African-American plaintiff alleged that, while watching a news report on a workplace television about the capture of the infamous D.C. snipers in 2002, a co-worker exclaimed in his presence, "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f[uc]k them." See Jordan, 458 F.3d at 336. The plaintiff, Jordan, reported the comment to his supervisors and was fired within a month of his complaint. Id. at 337. Jordan then filed suit against his employers, alleging, inter alia, retaliatory discharge in contravention of Title VII and § 1981. Id. The district court dismissed Jordan's complaint under Federal Rule of Civil Procedure 12(b)(6) for

12

failure to state a claim upon which relief can be granted, and Jordan appealed to our Court, which affirmed by a split panel decision.

Addressing the Title VII retaliation claim, the opinion of the panel majority related that, under Title VII, "'[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.'" Jordan, 458 F.3d at 338 (quoting 42 U.S.C. § 2000e-3(a)). The majority continued that, "[r]eading the language generously to give effect to its purpose, however, we have also held that opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful." Id. (citing Navy Fed., 424 F.3d at 406-07).

The Jordan majority observed that the employment practices that may be the subject of protected opposition activity include discrimination under 42 U.S.C. § 2000e-2(a)(1) in the form of "maintaining a racially hostile work environment, i.e., a 'workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Jordan, 458 F.3d at 339 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The

13

majority further recognized that "[c]ourts determine 'whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). As the majority explained, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" Id. (quoting Faragher, 524 U.S. at 788). The majority also noted that "hostile work environments generally result only after an accumulation of discrete instances of harassment." Id. (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts.")).

To assess the merits of Jordan's Title VII retaliation claim, the panel majority clarified, "the question reduces to whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one." Jordan, 458 F.3d at 339. The majority first concluded that no hostile work

14

environment actually existed, in that the "black monkeys" comment — though "unacceptably crude and racist" — "was an isolated response directed at the snipers" rather than "any fellow employee." Id. at 339-40. The majority underscored that the comment "was a singular and isolated exclamation" that did not and could not have "altered the terms and conditions of [Jordan's] employment," and that Jordan did "not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm." Id. at 340.

Turning to the issue of Jordan's reasonable belief, the panel majority concluded that "no objectively reasonable person could have believed that [Jordan's workplace] was in the grips of a hostile work environment." Jordan, 458 F.3d at 341. But the majority also acknowledged that, pursuant to Navy Federal, Jordan could rely on a reasonable belief that a hostile work environment "was taking shape." See id. at 340-41 ("Navy Federal holds that an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress."); see also Navy Fed., 424 F.3d at 406-07 (concluding that plaintiff reasonably believed she was opposing unlawful retaliation by disrupting plan that had been set in motion by employer to terminate another employee for her

15

discrimination complaints). The majority elaborated that, "[u]nder § 2000e-3(a) as construed by Navy Federal, we cannot simply assume, without more, that the opposed conduct will continue or will be repeated unabated; rather, the employee must have an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes." Jordan, 458 F.3d at 341 (emphasis omitted). From there, the majority determined that Jordan could not establish a reasonable belief that a hostile work environment was in progress, in that "no allegation in the complaint suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur." Id. at 340. Accordingly, the majority opinion affirmed the dismissal of Jordan's Title VII retaliation claim, as well as his § 1981 retaliation claim.

The Jordan dissent agreed with the panel majority that, to gain protection for his opposition activity, an employee may rely on a reasonable belief that Title VII is in the process of being violated by the conduct being opposed. See Jordan, 458 F.3d at 352 (King, J., dissenting) (citing Navy Fed., 424 F.3d at 406-07). The dissent disputed the majority's view, however, that Navy Federal requires an employee opposing a potential hostile work environment to prove "that a plan was in motion to create such an environment." That is, the dissent distinguished

16

the discrete action opposed by the Navy Federal plaintiff (the imminent retaliatory discharge of another employee) from the conduct opposed in Jordan (conduct that, if repeated, could amount to a hostile work environment).

The Jordan dissent concluded that, "[b]y opposing racially charged conduct that he reasonably believes could be part and parcel of a hostile work environment, a reporting employee has opposed the impermissible whole, even absent an independent basis for believing the conduct might be repeated." Jordan, 458 F.3d at 354. "Indeed," the dissent emphasized, "we require employees to report such incidents in order to prevent hostile work environments from coming into being." Id. (referring to employer's affirmative Ellerth/Faragher defense, see Faragher, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998), imposing duty on employee to avoid harm by reporting harassment to employer). The dissent further highlighted precedent observing "that an employee's 'generalized fear of retaliation does not excuse a failure to report' harassing conduct, because 'Title VII expressly prohibits any retaliation against [employees] for reporting . . . harassment.'" Id. at 355 (alterations in original) (quoting Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir. 2001)). And, the dissent stressed the Supreme Court's then-recent edict that "'[i]nterpreting the antiretaliation

17

provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VII's] primary objective' — preventing harm — 'depends.'" Id. at 352 (alteration in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)).

At bottom, the Jordan dissent recognized that the "black monkeys" comment made by Jordan's co-worker "is the stuff of which a racially hostile work environment is made," and thus that "it was entirely reasonable for Jordan to believe that, in reporting the . . . comment to his employers, he was opposing a racially hostile work environment." Jordan, 458 F.3d at 355. The dissent lamented that, because of the panel majority's opinion to the contrary, "employees in this Circuit who experience racially harassing conduct are faced with a 'Catch-22.'" Id. As the dissent explained those employees' quandary, "[t]hey may report such conduct to their employer at their peril (as Jordan did), or they may remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation." Id. But see Jordan, 458 F.3d at 342 (the majority's retort that "Jordan's dilemma, that the law is inconsistent by both encouraging and discouraging 'early' reporting, is presented too abstractly. The strong policy of removing and preventing workplace discrimination can and does coexist with Navy Federal's objective reasonableness standard").

18

The opinion of the Jordan majority thereafter withstood a petition for rehearing en banc, which was denied on a 5-5 vote of the judges then in active service. See Jordan v. Alternative Res. Corp., 467 F.3d 378 (4th Cir. 2006).

3.

Here, by its decision of April 5, 2013, the district court relied on Jordan and awarded summary judgment to the defendants, adopting their contentions that Clubb's conduct was not so severe or pervasive as to create a hostile work environment or to instill a reasonable belief in Liberto, such as would protect her from retaliation, that she had been unlawfully harassed. See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212 (D. Md. Apr. 5, 2013), ECF No. 52.[3]  In rejecting Liberto's hostile

---

[3] The district court's grounds for awarding summary judgment — the lack of severe or pervasive conduct (element three of the hostile work environment claims) and a protected activity (element one of the retaliation claims) — were the sole grounds that had been propounded by the defendants. See supra Part I.B.1.  Regardless, the court acknowledged the balance of the elements of Liberto's claims and accepted that they had been satisfied.  With respect to the hostile work environment claims, that meant Liberto had shown unwelcome conduct (element one), based on her race (element two), which, "[g]iven Clubb's position in Clarion's management structure," was imputable to the employer (element four). See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, slip op. at 5 (D. Md. Apr. 5, 2013), ECF No. 52.  As for the retaliation claims, the court deemed it "indisputable" that the defendants took an adverse employment action against Liberto (element two) and that there was a causal link between her racial harassment complaint and the adverse employment action (element three). Id. at 7.

19

work environment claims, the district court determined that "[t]he two incidents of use of a racial epithet, assuming they occurred as Liberto testified, simply do not comprise either pervasive or severe conduct, however unacceptable they are." Id. at 6. The court explained that it had "compare[d] the evidence in this case to that in [three others]" and "conclude[d] the conduct at issue here does not rise to the level of conduct found to be severe or pervasive in those Fourth Circuit cases." Id. (citing Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002) ("Anderson was subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating sort."); Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 199 (4th Cir. 2000) ("Ms. Conner experienced regular, profound humiliation because of her gender, unlike the male machine operators."); Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) ("[Amirmokri] testified that for six months . . . co-workers abused him almost daily, calling him names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf.'")). The district court then invoked Jordan for the proposition that an "isolated racist comment" is "'a far cry from . . . an environment of crude and racist conditions so severe or pervasive that they alter[] the conditions of [plaintiff's] employment.'" Id. (third alteration in original) (quoting Jordan, 458 F.3d at 340). In concomitantly rejecting

20

Liberto's retaliation claims, the court again looked to Jordan and ruled that "'no objectively reasonable person could have believed that the [plaintiff's work environment] was, or was soon going to be, infected by severe or pervasive racist, threatening, or humiliating harassment.'" Id. at 8 (alteration in original) (quoting Jordan, 458 F.3d at 341).

Liberto timely noted her appeal, and the matter was reviewed by a three-judge panel of this Court. See Boyer-Liberto v. Fontainebleau Corp., 752 F.3d 350 (4th Cir. 2014). The panel decision was unanimous that the defendants were properly awarded summary judgment on Liberto's hostile work environment claims, in that Clubb's "use of [the term 'porch monkey'] twice in a period of two days in discussions about a single incident, was not, as a matter of law, so severe or pervasive as to change the terms and conditions of Liberto's employment." Id. at 356. The panel observed that Liberto had "not pointed to any Fourth Circuit case, nor could she, finding the presence of a hostile work environment based on a single incident." Id. at 358 (comparing Jordan with Anderson, Conner, and Amirmokri).

The panel was split, however, with respect to Liberto's retaliation claims. The opinion of the panel majority validated the district court's summary judgment award on those claims, explaining that, "if no objectively reasonable juror could have

21

found the presence of a hostile work environment, as we today hold, it stands to reason that Liberto also could not have had an objectively reasonable belief that a hostile work environment existed." Boyer-Liberto, 752 F.3d at 360 (emphasis omitted). Although the panel majority allowed that an "employee's opposition may be protected before the hostile environment has fully taken form," the majority faulted Liberto for failing to "present any indicators that the situation at the Clarion would have ripened into a hostile work environment." Id. In that regard, the majority equated Liberto's case with Jordan. See id. ("Just as in Jordan, we conclude here that 'while in the abstract, continued repetition of racial comments of the kind [Clubb] made might have led to a hostile work environment, no allegation in the [record] suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur.'" (alterations in original) (quoting Jordan, 458 F.3d at 340)); see also id. at 361 (Shedd, J., concurring) ("Based on this Court's decision in Jordan . . . , I agree with Judge Niemeyer that summary judgment should . . . be affirmed on the retaliation claim.").

The dissent distinguished the facts in this case from those in Jordan and concluded that, "[p]articularly in light of these significant differences, . . . Liberto could have reasonably believed that Clubb's conduct was actionable." Boyer-Liberto,

22

752 F.3d at 363 (Traxler, C.J., concurring in part and dissenting in part) (pointing out that Jordan's co-worker made a single comment not directed at Jordan or another employee, while Clubb called Liberto herself "the very same name in the very same threatening context" on two consecutive days). In any event, the dissent also questioned whether Jordan was correctly decided. See id. ("I share in the sentiment Judge King expressed so well in his dissent in Jordan that our very narrow interpretation of what constitutes a reasonable belief in this context has placed employees who experience racially discriminatory conduct in a classic 'Catch-22' situation." (alteration and internal quotation marks omitted)).

Following issuance of the panel's decision, Liberto sought rehearing en banc, and a majority of our judges in regular active service voted to grant Liberto's petition. Accordingly, the panel's decision was vacated, and today our en banc Court assesses anew the propriety of the district court's summary judgment award to the defendants. See 4th Cir. R. 35(c).

II.

We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving party. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Summary judgment is appropriate "if the

23

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.

### A.

### 1.

We begin by addressing Liberto's hostile work environment claims — an endeavor that leads us to outline pertinent legal principles, including some of those already identified above. Title VII renders it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer contravenes § 2000e-2(a)(1) by, inter alia, requiring an African-American employee to work in a racially hostile environment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986). A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

24

Thus, to prevail on a Title VII claim that a workplace is racially hostile, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted). The same test applies to a hostile work environment claim asserted under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001); see also 42 U.S.C. § 1981(a) (providing that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens"); Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369, 373 (2004) (recognizing that hostile work environment claims may be brought under § 1981).

Element three of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"; the plaintiff may, but is not required to, establish that the environment is "psychologically injurious." See Harris, 510 U.S. at 22. Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the

plaintiff's position." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998). That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23. It "is not, and by its nature cannot be, a mathematically precise test." <u>Id.</u> at 22.

To be sure, viable hostile work environment claims often involve repeated conduct. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115-17 (2002). That is because, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." <u>Id.</u> at 115. For example, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." <u>Harris</u>, 510 U.S. at 21 (alteration in original) (quoting <u>Meritor</u>, 477 U.S. at 67). The same goes for "simple teasing [and] offhand comments." <u>See</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998). Importantly, however, an "isolated incident[]" of harassment can "amount to discriminatory changes in the terms and conditions of employment," if that incident is "extremely serious." <u>Id.</u> (internal quotation marks omitted).

26

In measuring the severity of harassing conduct, the status of the harasser may be a significant factor — e.g., "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993). Simply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998).

The status of the harasser also is relevant to element four of a hostile work environment claim, which necessitates proof that the harassment is imputable to the employer. On the one hand, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."). On the other hand, where the harasser is the victim's supervisor, "different rules apply": The employer is strictly liable for the supervisor's harassing behavior if it "culminates in a tangible employment action," but otherwise "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and

correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance, 133 S. Ct. at 2439 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). The Ellerth/Faragher defense, in essence, imposes a duty on the victim to report her supervisor's harassing behavior to the employer. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001) (discussing "employee's reporting requirement" under Faragher and Ellerth). Relatedly, a plaintiff seeking to impute liability to her employer for harassment by a co-worker may not be able to establish the employer's negligence if she did not report the harassment. See Vance, 133 S. Ct. at 2453 (recognizing that evidence relevant to negligence inquiry would include evidence that employer "failed to respond to complaints"); id. at 2464 (Ginsburg, J., dissenting) ("An employee may have a reputation as a harasser among those in his vicinity, but if no complaint makes its way up to management, the employer will escape liability under a negligence standard.").

For purposes of the employer's vicarious liability, the harasser qualifies as a supervisor, rather than a co-worker, "if he or she is empowered by the employer to take tangible employment actions against the victim." Vance, 133 S. Ct. at

28

2439 (majority opinion). An employee so empowered is able to "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 2443 (quoting Ellerth, 524 U.S. at 761). As such, a supervisor has the "authority to inflict direct economic injury." Id. at 2448.

To be considered a supervisor, the employee need not have the final say as to the tangible employment action; instead, the employee's decision may be "subject to approval by higher management." Vance, 133 S. Ct. at 2446 n.8 (citing Ellerth, 524 U.S. at 762). The Vance Court determined that one of the harassers in Faragher "possessed the power to make employment decisions having direct economic consequences for his victims" based on the following: "No one [had been] hired without his recommendation"; he "initiated firing and suspending personnel"; his performance evaluations "translated into salary increases"; and he "made recommendations regarding promotions." Id. (internal quotation marks omitted). Additionally, the Court observed that, "even if an employer concentrates all decision-making authority in a few individuals, it likely will not isolate itself from heightened liability under Faragher and Ellerth," in that those individuals likely will have to rely on the recommendations of others, and "the employer may be held to

have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." Id. at 2452 (citing Ellerth, 524 U.S. at 762).

2.

In seeking summary judgment on Liberto's hostile work environment claims, the defendants' sole contention was that there had been no showing that Clubb's conduct was severe or pervasive enough to alter Liberto's conditions of employment and produce an abusive work environment. Liberto's counter-arguments included that there was a genuine dispute as to whether the harassment she suffered on September 14 and 15, 2010, was sufficiently severe. To resolve that issue today, we need not — and, in any event, on this record cannot — determine whether Clubb was actually Liberto's supervisor or simply her co-worker, a fact relevant to the separate question of the Clarion's vicarious liability. Nevertheless, we are obliged to consider how Clubb portrayed her authority and what Liberto thus reasonably believed Clubb's power to be. See Oncale, 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position . . . .").

The defendants have suggested that, because Liberto understood Clubb to be a "glorified hostess" and not a restaurant manager, see J.A. 213-14, Liberto could not have

30

reasonably perceived that Clubb's conduct was severe enough to create a hostile work environment. That premise ignores evidence, however, that Clubb repeatedly and effectively communicated to Liberto prior to September 14, 2010, that Clubb had Dr. Berger's ear and could have Liberto fired. See, e.g., id. at 274 (Liberto's deposition testimony that Clubb "did have power that I did not have"); id. at 279 ("I felt extremely singled out and that my position was being threatened and it was very clear."); id. ("I was told what my place was. . . . And [Clubb] always made it clear that Dr. Berger would listen to anything she said and wouldn't believe me.").

The defendants' theory also fails to take into account Clubb's assertion of power in the course of her harassment of Liberto. On September 14, 2010, Clubb berated Liberto's job performance before threatening "to get [her]" and "make [her] sorry," and then calling her a "damn porch monkey" or a "dang porch monkey." See J.A. 252-53, 258. The following day, Clubb obstructed Liberto's attempted report of racial harassment to Food and Beverage Director Heubeck by telling Liberto, "I need to speak to you, little girl," and "I'm more important [than Heubeck]." Id. at 263-64. Immediately thereafter, Clubb again reprimanded Liberto, again threatened to "get [her]" and to "go to Dr. Berger," and again called her a "porch monkey." Id. at 266. Finally, while speaking with Liberto on September 18 about

31

her racial harassment complaint, General Manager Elman validated Clubb's assertion of authority by declaring Clubb to be Liberto's "boss." Id. at 324.

Properly considering that evidence, we must accept that Liberto believed — and reasonably so — that Clubb could make a discharge decision or recommendation that would be rubber-stamped by Dr. Berger. Thus, in gauging the severity of Clubb's conduct, we deem Clubb to have been Liberto's supervisor. Cf. Vance, 133 S. Ct. at 2446 n.8, 2452 (recognizing that, for purposes of employer's vicarious liability, employee may qualify as supervisor if she can initiate tangible employment actions "subject to approval by higher management" or make recommendations on which employer relies). And we view Clubb's conduct as having the "particular threatening character" of harassment perpetrated by a supervisor against her subordinate. See Ellerth, 524 U.S. at 763. That perspective is especially appropriate here, where Clubb employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate Liberto's employment.

We also grasp that the use of Clubb's chosen slur — "porch monkey" — is about as odious as the use of the word "nigger." See Spriggs, 242 F.3d at 185. The latter epithet, of course, "is pure anathema to African-Americans." Id. Similarly, describing an African-American as a "monkey," and thereby

32

"suggest[ing] that a human being's physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."  Id.; see also, e.g., Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 911 (8th Cir. 2006) (recognizing that "[p]rimate rhetoric has been used to intimidate African-Americans" and that "[t]he use of the term 'monkey' and other similar words," including the variation "porch monkey," has "been part of actionable racial harassment claims across the country" (citing cases)).  As we and several of our sister courts of appeals have recognized, "'[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.'"  Spriggs, 242 F.3d at 185 (quoting Rodgers, 12 F.3d at 675); accord Ellis v. Houston, 742 F.3d 307, 325-26 (8th Cir. 2014); Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013); Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2012); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1116 (9th Cir. 2004).

Consequently, a reasonable jury could find that Clubb's two uses of the "porch monkey" epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — were severe enough to engender a hostile work environment.  Cf. Adams

v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1253-54 (11th Cir. 2014) (concluding that, although a Caucasian supervisor's carving of "porch monkeys" into the aluminum of a ship where he was working with the African-American plaintiff "was an isolated act, it was severe"); Ayissi-Etoh, 712 F.3d at 577 (acknowledging that, where a supervisor "used a deeply offensive racial epithet ['nigger'] when yelling at Ayissi-Etoh to get out of the office," that "single incident might well have been sufficient to establish a hostile work environment"); id. at 580 (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a supervisor — as Ayissi-Etoh alleges happened to him — suffices by itself to establish a racially hostile work environment.").

In thus vacating the summary judgment award on Liberto's hostile work environment claims, we identify this as the type of case contemplated in Faragher where the harassment, though perhaps "isolated," can properly be deemed to be "extremely serious." See Faragher, 524 U.S. at 788. We also acknowledge that this is a first for our Court. We reject, however, any notion that our prior decisions, including Jordan v. Alternative Resources Corp., were meant to require more than a single incident of harassment in every viable hostile work environment case. Specifically, we observe that the district court improperly analogized this matter (involving a racial epithet

34

directed at Liberto by her supervisor) to <u>Jordan</u> (concerning a racist remark that was made by a mere co-worker and not aimed at Jordan or any other employee). <u>See</u> 458 F.3d 332, 339-40 (4th Cir. 2006). We further note that, in the cases unfavorably compared to this one by the district court, the harassment was so severe and pervasive that there were no close calls. <u>See</u> <u>Anderson v. G.D.C., Inc.</u>, 281 F.3d 452, 459 (4th Cir. 2002) ("The evidence was unquestionably sufficient to submit Anderson's hostile environment claim to the jury."); <u>Conner v. Schrader-Bridgeport Int'l, Inc.</u>, 227 F.3d 179, 199 (4th Cir. 2000) ("[T]here is ample support for the jury finding of severe or pervasive conduct sufficient to constitute a hostile work environment."); <u>Amirmokri v. Balt. Gas & Elec. Co.</u>, 60 F.3d 1126, 1131 (4th Cir. 1995) ("A reasonable person could easily find this atmosphere to be hostile."). Liberto's case may be different from <u>Anderson</u>, <u>Conner</u>, and <u>Amirmokri</u>, but it is no less worthy of a jury trial.[4]

---

[4] We do not suggest that a jury should be limited to assessing whether Clubb's two uses of the "porch monkey" slur, without more, created a hostile work environment. A jury also would be entitled to consider other evidence potentially indicative of severe or pervasive harassment, including Clubb's treatment of Liberto throughout her short tenure at the Clarion; Clubb's shouting, spitting, and stalking on the night of September 14, 2010; and Clubb's use of the term "little girl" to refer to Liberto on September 15. <u>See, e.g.</u>, <u>Conner</u>, 227 F.3d at 197 ("The more serious incidents enumerated here were complemented by numerous additional occurrences that, in (Continued)

B.

1.

Turning to Liberto's retaliation claims, Title VII proscribes discrimination against an employee because, in relevant part, she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Employees engage in protected oppositional activity when, inter alia, they "complain to their superiors about suspected violations of Title VII." Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543-44 (4th Cir. 2003). To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove "(1) that she engaged in a protected activity," as well as "(2) that her employer took an adverse employment action against her," and "(3) that there was a causal link between the two events." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004); see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 446

---

isolation, may have seemed less problematic, but which actually served to exacerbate the severity of the situation.").

36

(2008) (confirming that "§ 1981 encompasses retaliation claims").[5]

In the context of element one of a retaliation claim, an employee is protected when she opposes "not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful." Navy Fed., 424 F.3d at 406. The Title VII violation may be complete, or it may be in progress. See id. at 406-07; see also Jordan, 458 F.3d at 340-41 ("Navy Federal holds that an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress."); Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003) (concluding, in reliance on decisions under Title VII, that "to show protected activity, the plaintiff in a Title VI retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring" (alterations and internal quotation marks omitted)). In other words, an

---

[5] We observe that, although the elements of prima facie Title VII and § 1981 retaliation claims are identical, the causation standard for a Title VII claim may differ from that for a § 1981 claim after the Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013) (holding that but-for standard of causation applies to Title VII retaliation claims). We need not consider that question today, however, because the defendants have raised no issue with respect to causation.

employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress.

a.

The panel majority in Jordan ruled that, where an employee has complained to his employer of an isolated incident of harassment insufficient to create a hostile work environment, the employee cannot have possessed a reasonable belief that a Title VII violation was in progress, absent evidence "that a plan was in motion to create such an environment" or "that such an environment was [otherwise] likely to occur." See 458 F.3d at 340. We reject that aspect of Jordan today, however, for several reasons.

First of all, the Jordan standard "imagines a fanciful world where bigots announce their intentions to repeatedly belittle racial minorities at the outset, and it ignores the possibility that a hostile work environment could evolve without some specific intention to alter the working conditions of African-Americans through racial harassment." See Jordan, 458 F.3d at 353-54 (King, J., dissenting). Tellingly, intent to create a hostile work environment is not an element of a hostile environment claim.

The Jordan standard also is at odds with the hope and expectation that employees will report harassment early, before

38

it rises to the level of a hostile environment. Where the harasser is her supervisor and no tangible employment action has been taken, the victim is compelled by the <u>Ellerth</u>/<u>Faragher</u> defense to make an internal complaint, i.e., "to take advantage of any preventive or corrective opportunities provided by the employer." See <u>Faragher</u>, 524 U.S. at 807. Similarly, the victim of a co-worker's harassment is prudent to alert her employer in order to ensure that, if the harassment continues, she can establish the negligence necessary to impute liability. See <u>Vance</u>, 133 S. Ct. at 2453. The reporting obligation is essential to accomplishing Title VII's "primary objective," which is "not to provide redress but to avoid harm." See <u>Faragher</u>, 524 U.S. at 806. Thus, we have recognized that the victim is commanded to "report the misconduct, not investigate, gather evidence, and then approach company officials." See <u>Matvia v. Bald Head Island Mgmt., Inc.</u>, 259 F.3d 261, 269 (4th Cir. 2001). Further, we have emphasized that an employee's "generalized fear of retaliation does not excuse a failure to report . . . harassment," particularly where "Title VII expressly prohibits any retaliation against [the reporting employee]." See <u>Barrett</u>, 240 F.3d at 267.

But rather than encourage the early reporting vital to achieving Title VII's goal of avoiding harm, the <u>Jordan</u> standard deters harassment victims from speaking up by depriving them of

39

their statutory entitlement to protection from retaliation. Such a lack of protection is no inconsequential matter, for "fear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination." See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 279 (2009) (internal quotation marks omitted). Quelling that fear, the Crawford Court extended protection "to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation." See id. at 273. To do otherwise, the Court explained, would "create a real dilemma for any knowledgeable employee." Id. at 279. Namely, "[i]f the employee reported discrimination in response to the enquiries, the employer might well be free to penalize her for speaking up. But if she kept quiet about the discrimination and later filed a Title VII claim, the employer might well escape liability [by invoking the Ellerth/Faragher defense]." Id. The Court concluded that "[n]othing in the statute's text or our precedent supports this catch-22." Id. Of course, the same can be, and has been, said about the Jordan standard. See Jordan, 458 F.3d at 355 (King, J., dissenting) ("As a result of today's decision, employees in this Circuit who experience racially harassing conduct are faced with a 'Catch-22.'").

40

Put succinctly, the Jordan standard is incompatible with Crawford, as well as other Supreme Court decisions directing that Title VII's antiretaliation provision be interpreted "to provide broad protection from retaliation." See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); see also, e.g., Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 173-75 (2011). As the Burlington Northern Court explained, Title VII must be read "to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination," because "effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances." See 548 U.S. at 66-67 (internal quotation marks omitted)).

Finally, we need look no further than Jordan itself to comprehend that the Jordan standard is unsuited to its purpose. In Jordan's presence, his co-worker made a comment that, "in a single breath, . . . equated African-Americans with 'black monkeys' and 'black apes,' and implied a savage, bestial sexual predilection acutely insulting to members of the African-American community." See Jordan, 458 F.3d at 351 (King, J., dissenting). Jordan then did exactly what Title VII hopes and expects: He reported the comment to his employers in an effort to avert any further racial harassment. Because of his internal complaint, however, Jordan was fired. In light of the text and

41

purpose of Title VII, as well as controlling Supreme Court and Fourth Circuit decisions, Jordan surely merited protection from retaliation. That is,

> [w]ithout question, [the comment made by Jordan's co-worker] is the stuff of which a racially hostile work environment is made. On the allegations here, it was entirely reasonable for Jordan to believe that, in reporting the racially charged 'black monkeys' comment to his employers, he was opposing a racially hostile work environment.

Id. at 355 (citations omitted). But, by devising and applying the Jordan standard, we denied Jordan any legal recourse for his retaliatory discharge. In these circumstances, the Jordan standard plainly cannot endure.

b.

The question, then, becomes this: What is the proper standard for determining whether an employee who reports an isolated incident of harassment has a reasonable belief that she is opposing a hostile work environment in progress? We conclude that, when assessing the reasonableness of an employee's belief that a hostile environment is occurring based on an isolated incident, the focus should be on the severity of the harassment. Cf. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (looking to severity of single incident in evaluating reasonableness of employee's belief that incident created actionable hostile environment). That assessment thus involves factors used to judge whether a workplace is sufficiently

42

hostile or abusive for purposes of a hostile environment claim —
specifically, whether the discriminatory conduct "is physically
threatening or humiliating, or a mere offensive utterance." See
Harris, 510 U.S. at 23. Of course, a single offensive utterance
— e.g., "simple teasing" or an "offhand comment[]," see
Faragher, 524 U.S. at 788 — generally will not create a hostile
environment without significant repetition or an escalation in
the harassment's severity. See Ayissi-Etoh, 712 F.3d at 579
(Kavanaugh, J., concurring) ("The more severe the harassment,
the less pervasive it needs to be, and vice versa." (internal
quotation marks omitted)). But an isolated incident that is
physically threatening or humiliating will be closer — even if
not equal — to the type of conduct actionable on its own because
it is "extremely serious." See Faragher, 524 U.S. at 788.

Accordingly, as relevant here, an employee will have a
reasonable belief that a hostile work environment is occurring
based on an isolated incident if that harassment is physically
threatening or humiliating. This standard is consistent not
only with Clark County, but also with other Supreme Court
precedent, including Crawford and Burlington Northern. That is
so because it protects an employee like Jordan who promptly
speaks up "to attack the racist cancer in his workplace," rather
than "remain[ing] silent" and "thereby allowing [discriminatory]
conduct to continue unchallenged," while "forfeiting any

43

judicial remedy he might have." See Jordan, 458 F.3d at 356 (King, J., dissenting).

In sum, under the standard that we adopt today with guidance from the Supreme Court, an employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur. The employee will have a reasonable belief that a hostile environment is occurring if the isolated incident is physically threatening or humiliating.[6]

---

[6] Notably, in its brief as amicus curiae supporting Liberto, the EEOC urges us to adopt a standard suggested by the Jordan dissent: that an employee engages in a protected opposition activity when she complains about an isolated incident of harassment that would create a hostile work environment if repeated often enough. See Jordan, 458 F.3d at 354 (King, J., dissenting) ("When the cumulative nature of such an environment is properly considered, it is clear that employees are protected under Title VII from employer retaliation if they oppose conduct that, if repeated, could amount to a hostile work environment."). When the isolated incident is merely offensive — rather than physically threatening or humiliating — the if-repeated standard might well be appropriate. Contrary to the argument of the defendants, it is not necessarily precluded by the Supreme Court's Clark County decision. That is, although the Court concluded that the Clark County plaintiff had not engaged in a protected opposition activity by reporting an isolated incident that was merely offensive, the Court did so by assessing whether the plaintiff could have reasonably believed that incident alone created a hostile environment. See 121 S. Ct. at 270-71. The Court did not consider whether the plaintiff could have reasonably believed that a hostile work environment, even though not fully formed, was in progress. In any event, we (Continued)

Because the defendants contested Liberto's retaliation claims on the lone ground that she did not engage in a protected activity, our analysis is limited to whether a jury could find that Liberto reasonably believed there was a hostile work environment in progress when she reported Clubb's use of the "porch monkey" slur. Applying the standard that we adopt today, the answer plainly is "yes." As we recognized in analyzing Liberto's hostile work environment claims, "porch monkey" is a racial epithet that is not just humiliating, but "degrading and humiliating in the extreme." See Spriggs, 242 F.3d at 185. Indeed, we determined that a reasonable jury could find that Clubb's two uses of "porch monkey" were serious enough to engender a hostile environment. We must further conclude, therefore, in the context of the retaliation claims, that Liberto has made the lesser showing that the harassment was sufficiently severe to render reasonable her belief that a hostile environment was occurring. Accordingly, we vacate the summary judgment award on Liberto's retaliation claims, in addition to her hostile work environment claims. We also

---

need not decide herein whether to embrace the if-repeated standard for cases involving isolated, merely offensive incidents of harassment, because this matter involves more serious conduct.

underscore that, on remand, a jury would be entitled to simultaneously reject the hostile work environment claims on the ground that Clubb's conduct was not sufficiently serious to amount to a hostile environment, but award relief on the retaliation claims by finding that Clubb's conduct was severe enough to give Liberto a reasonable belief that a hostile environment, although not fully formed, was in progress.

C.

Our good dissenting colleague has a different view of the controlling law, the relevant facts, and even what our en banc majority does and does not say. See post at 68-106 (Niemeyer, J., dissenting). With respect to the hostile work environment claims, there is disagreement over what the Supreme Court meant by this sentence from Faragher:

> A recurring point in [our hostile environment] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

See 524 U.S. at 788 (internal quotation marks omitted). We read that sentence to pronounce that an isolated incident of harassment, if extremely serious, can create a hostile environment. But, clinging to Faragher's use of "isolated incidents" in the plural, the dissent posits that only multiple, "extremely serious isolated incidents . . . may produce a hostile work environment." Post at 88.

46

Clearly, it is the dissent's interpretation of Faragher — not ours — that is untenable. To illustrate, the dissent elsewhere observes that a hostile environment claim "must be 'based on the cumulative effect of individual acts,'" post at 71 (quoting Morgan, 536 U.S. at 115), and that, "to be actionable under Title VII, conduct must be so 'severe or pervasive' as 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" id. at 70 (alteration in original) (emphasis added) (quoting Meritor, 477 U.S. at 67). Strikingly, the dissent does not — and surely cannot — explain what differentiates "isolated incidents" that must be "extremely serious," from "individual acts" that may be "severe or pervasive." The dissent also quotes from Morgan that "'a single act of harassment may not be actionable on its own,'" id. at 71 (quoting Morgan, 536 U.S. at 115), without acknowledging the obvious import of Morgan's use of "may not" rather than "cannot." And, the dissent itself allows that a single, isolated incident of physical violence may be actionable, id. at 88, without even attempting to reconcile that proposition with its reading of Faragher.

Relatedly, the dissent criticizes us for "fail[ing] to note that the portions of Faragher to which [we] cite[] were part of the Supreme Court's much lengthier discussion — and substantively different message — describing the type of conduct

47

that would <u>not</u> violate Title VII." <u>Post</u> at 69. In pursuing its position, the dissent simply ignores <u>Faragher</u>'s use of "unless extremely serious" to designate an exception to those isolated incidents that are not unlawful on their own.

Meanwhile, the dissent repeatedly invokes <u>Faragher</u>'s observation, "Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII." <u>See</u> <u>Faragher</u>, 524 U.S. at 787 (internal quotation marks omitted). But the dissent overemphasizes the first part of that sentence, at one point quoting the entire sentence while underscoring only "<u>[m]ere utterance of an ethnic or racial epithet</u>," <u>see</u> <u>post</u> at 69, and at another point actually omitting the phrase "which engenders offensive feelings in an employee," <u>see</u> <u>id.</u> at 88. Of course, the phrase "which engenders offensive feelings in an employee" is a critical qualifier, signifying "a mere offensive utterance" rather than a more egregious slur that is "physically threatening or humiliating." <u>See</u> <u>Faragher</u>, 524 U.S. at 787-88 (explaining that the circumstances relevant to determining "whether an environment is sufficiently hostile or abusive" include "'whether it is physically threatening or humiliating, or a mere offensive utterance'" (quoting <u>Harris</u>, 510 U.S. at 23)).

48

In any event, the dissent consistently minimizes the seriousness of Clubb's two uses of the "porch monkey" slur by deeming them to be merely offensive as a matter of law. To do so, the dissent invents a test under which harassment cannot rise to the level of humiliating unless it is "publicly humiliating," and points out that "it appears that no one heard Clubb direct the epithet at Liberto on either occasion." See post at 88-89. The dissent also flouts our mandate to view the facts in the light most favorable to Liberto, and insists that, as a fact, "Liberto thought that she was being upbraided by a co-worker, not her supervisor." Id. at 89. Regardless of what else Liberto perceived about Clubb's status, however, there is ample evidence in the record showing that Liberto reasonably believed that Clubb possessed the one supervisory power that mattered: the power to follow through on her threats to have Dr. Berger rubber-stamp Liberto's discharge.[7]

---

[7] Notably, although the defendants themselves failed to argue in the district court that Clubb was not actually Liberto's supervisor, the dissent wanders into that issue and declares it "highly doubtful that Clubb . . . would qualify as Liberto's supervisor." See post at 84-85 (describing Clubb as "an employee whose only influence comes from having the ear of the company's owner because of their personal friendship"). The dissent's characterization of Clubb is contradicted by portions of the record, including the September 18, 2010 email in which Elman, the Clarion's General Manager, recounted responding to Liberto's racial harassment complaint by advising her that she and Clubb "need[ed] to learn to work together on a professional level and that [Clubb] was [Liberto's] boss." J.A. 324. Rather
(Continued)

49

As for the retaliation claims, the dissent accuses our en banc majority of "gratuitously proceed[ing] to adopt an unprecedented standard . . . that is much broader than necessary to resolve Liberto's claim[s]." Post at 93. The dissent's accusation rests on the false premise that we hold as a matter of law that a hostile work environment existed. In reality, we simply conclude that a reasonable jury could find for Liberto with respect to her hostile environment claims. Because it is possible that Liberto will instead come up short at trial on those claims, our retaliation analysis is essential. Indeed, we have emphasized that a jury may find that Clubb's conduct was insufficiently serious to engender a hostile environment, but severe enough to protect Liberto from retaliation by rendering reasonable her belief that such an environment was underway.

---

than grappling with that important evidence from the Clarion's own General Manager, the dissent chastises us for considering what it glibly terms "Elman's apparent understanding of Clubb's relationship to Liberto." See post at 86 n.*.

Meanwhile, two other of our good colleagues deem Clubb to have been Liberto's mere co-worker and thereby conclude that the Clarion cannot be held vicariously liable for Clubb's harassment of Liberto. See post at 56-58 (Wilkinson, J., concurring in part and dissenting in part, joined by Agee, J.). Those colleagues not only disregard evidence that Clubb was Liberto's supervisor, but also urge affirmance of the summary judgment award with respect to the hostile environment claims on a ground that the defendants failed to raise or preserve in the district court.

50

Unfortunately, there are further instances of the dissent's inaccurate portrayal of today's decision.  For example, although we observe herein that our standard "protects an employee like Jordan" from retaliation, the dissent asserts that we nowhere "indicate that the plaintiff in Jordan had a reasonable belief that a hostile work environment was taking shape at the time he reported his co-worker's racist comment to his supervisors." See post at 99.  So, for the sake of clarity (though too late to benefit Jordan himself), we state in plain terms that a jury applying our standard could have found that Jordan reasonably believed he was opposing a hostile environment in progress. That is because the "black monkeys" comment uttered to Jordan — like the "porch monkey" slurs aimed at Liberto — could readily be deemed physically threatening or humiliating.

We are entirely unswayed by the dissent's warning that our standard "will generate widespread litigation over the many offensive workplace comments made everyday that employees find to be humiliating."  See post at 93-94.  Our standard is implicated solely when an employee suffers retaliation for engaging in an oppositional activity, and can be satisfied only by showing the objective reasonableness of the employee's belief that an isolated incident of harassment was physically threatening or humiliating.  We also reject the dissent's prediction that our "standard will surely generate many new

51

questions" and "much hand-wringing" over which harassing conduct qualifies as sufficiently severe. See id. at 96, 105. Judges and juries have been identifying what is humiliating, as well as what is physically threatening or merely offensive, since at least 1993, when the Supreme Court explained in Harris how to determine whether a workplace is objectively hostile or abusive for purposes of a hostile environment claim. See 510 U.S. at 23.[8]

Finally, we are perplexed and dismayed by the dissent's assertions that, on the one hand, "Liberto had every right to be offended by Clubb's use of a racial epithet and acted reasonably and responsibly in reporting the incident," see post at 98, and that, on the other hand, Liberto spoke up too soon and thereby deprived herself of protection from retaliation. As the dissent would have it, although reporting Clubb's slur was a sensible thing to do, Liberto should have waited for additional harassment to occur — but not so much harassment that the

---

[8] Two of our colleagues issue dire warnings that today's decision may cause "employers [to] become speech police," "employees [to be] estranged from one another," and "companies [to] become private sector analogues of the surveillance state." See post at 55 (Wilkinson, J., concurring in part and dissenting in part, joined by Agee, J.). We cannot agree, however, that by simply protecting an employee who, for example, reports a race-based comment that she reasonably believes to be physically threatening or humiliating, we might somehow silence or segregate the workforce.

Clarion could avoid vicarious liability because of a lack of timely notice. Concomitantly, the dissent contends that our decision "manifests a fundamental distrust of employers, assuming that, once a humiliating epithet is uttered, the development of a hostile work environment is a fait accompli — in other words, that employers are powerless or unwilling to prevent a descent into pervasive hostility." Id. at 105.

Contrary to the dissent, we seek to promote the hope and expectation — ingrained in our civil rights laws and the Supreme Court decisions interpreting them — that employees will report harassment early, so that their employers can stop it before it rises to the level of a hostile environment. Employers are powerless in that regard only if they are unaware that harassment is occurring. But employees will understandably be wary of reporting abuse for fear of retribution. Under today's decision, employees who reasonably perceive an incident to be physically threatening or humiliating do not have to wait for further harassment before they can seek help from their employers without exposing themselves to retaliation.

IV.

Pursuant to the foregoing, we vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

VACATED AND REMANDED

WILKINSON, Circuit Judge, with whom AGEE, Circuit Judge, joins, concurring in part and dissenting in part:

The remarks alleged in this Title VII action are ones that Americans of every race and all walks of life would find so wounding that the word offensive does not begin to describe them. It is incidents such as these, small as they may appear, that prevent our larger society from becoming the place of welcome it needs to be.

The good done by the civil rights laws has been enormous and one aim of those laws, as I understand it, is to make the workplace an environment where Americans of every race, religion, sex, or national origin would actually want to work. 42 U.S.C. § 2000e-2 and 2000e-3.

To say that a good workplace environment is poisoned by the kind of remarks alleged here is an understatement. Who would wish to get up and come to work each morning fearful of encountering this sort of slur during the course of the working day?

There is a countervailing danger at play in these cases, however, namely that we not imbue the workplace with such stringent hostile work environment requirements that employers become speech police, that employees are estranged from one another, and that companies become private sector analogues of the surveillance state.

Where and how to strike the balance? In this case I would decline to hold the employer vicariously liable on the merits of the hostile work environment claim, but I would allow Boyer-Liberto's retaliation claim to proceed. In fact, were the truth of her complaint ascertained by the employer, the "retaliation" should have taken the form of Clubb's dismissal and not Boyer-Liberto's.

I.

As to the merits of the hostile work environment claim, I would affirm the judgment of the district court on the grounds that any other result would stretch the notion of vicarious employer liability past the breaking point. There may be an understandable temptation to land hard on this employer, but there are dangers down the road. Holding employers liable for remarks made by one of their employees where the majority points to no prior notice to the employer and no prior employer awareness of Clubb's racist tendencies is all too open-ended. To be sure, an employer is "directly liable" for a co-worker's unlawful harassment if "the employer was negligent with respect to the offensive behavior." Vance v. Ball State Univ., 133 S. Ct. 2434, 2441 (2013). But while the majority tries to make it appear as though some other evidence of employer malfeasance may be somewhere in the offing, see Maj. Op. at 35 n.4, its opinion

56

is wholly focused on the two incidents and remarks at issue and intent on directing a trial where the element of imputed employer liability has not been placed genuinely in dispute.

Whatever hazy ground Clubb may occupy between co-worker and supervisor, the hazards of imposing employer liability for remarks made by mid-level workers in workforces that might number in the hundreds or even thousands pushes imputed liability well beyond the more cabined circumstances of physical injury and actual adverse employment actions such as failures to promote or discharge. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006). In this case, there were roughly seventy-five people in the hotel's food and beverage department alone. J.A. 135.

Having liability hinge upon utterances, of which companies have no prior awareness and which no victim has yet reported to them, poses more than the threat of open-ended liability. Because liability hinges on unanticipated utterances, it will tend to drive employers as a protective measure into the role of censors of all speech that even conceivably could give offense. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (rejecting employer liability for "the sporadic use of abusive language, gender-related jokes, and occasional teasing" (citation and quotation marks omitted)). We may assuredly expect the arrival of workplace speech codes, which, if not already

57

present, will not be long in coming. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (noting that Title VII was not meant to be "a general civility code for the American workplace"). Such a heavy employer hand is a high price to pay for the majority's holding, and it is one that is not congruent with Supreme Court rulings or consistent with our freedoms.

## II.

As to the Title VII retaliation claim, an employee must show that her belief that a hostile work environment exists or is coming into existence is objectively reasonable. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam) (applying the objective standard); EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir. 2005).

Under the circumstances presented here, Liberto's belief that a hostile work environment existed or was coming into existence was objectively reasonable. The words alleged to have been spoken by Clubb were abhorrent. Moreover, Clubb uttered the epithet on separate occasions and directed it personally at Liberto. And the entire course of conduct surrounding the offensive remarks was abusive. This conduct on the part of Clubb was enough to bring Boyer-Liberto under the protection of the anti-retaliation provision of Title VII when she reported it. An

58

employee is not an expert in hostile work environment law. Any reasonable person must feel free to report this sort of vilification without being subject to retaliatory actions. An employee must feel safe and secure in bringing an incident of this nature to the attention of management.

Any decent management, moreover, would seemingly wish to know of such an occurrence under its roof. Employers must have complaint procedures for employees to utilize at an early stage -- before harassing environments intensify and spread. See Faragher v. City of Boca Raton, 524 U.S. 775, 806-08 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998). Employers are due adequate notice so that they may head off both the hostile work environment and any resultant liability. Employees benefit when an emergent hostile work environment is nipped in the bud.

But here, too, there is a balance to be struck. The annual number of Title VII retaliation charges filed with the EEOC has nearly doubled since the late 1990s. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2531 (2013). Perhaps American employers have become twice as likely to retaliate against employees since 1997, but I doubt it. One cause of the dramatic increase of retaliation claims may very well be a sub voce chipping away at the objectively reasonable belief standard. See Id. at 2531-32 (suggesting that "lessening the causation

59

standard" for retaliation claims "could also contribute to the filing of frivolous claims"). The majority's approach may very well "raise the costs, both financial and reputational, on an employer" where there is no true objectively reasonable belief in the existence of a hostile workplace. Id. at 2532.

The dangers of allowing the objective standard to slip, however, go far beyond the financial and reputational costs to companies. Two severe, if subtle, side effects warrant discussion: the trammeling of free speech and the construction of workplace barriers between the races and sexes.

### A.

If courts lessen their insistence on an objectively reasonable belief in a hostile environment and permit the reporting of all manner of perceived slights to warrant Title VII protection, we become party to the creation of the workplace as a zone where First Amendment values have ceased to be observed. In the context of a hostile work environment claim, it is "crucial" to use an objectively reasonable person standard "to ensure that courts and juries do not mistake ordinary socializing in the workplace" for actionable discrimination. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). The same is true for retaliation claims.

People will -- and should -- discuss controversial matters at work. Some of those subjects may well pertain to race and

60

gender. Disagreement on these and other matters may be heated and robust, but it should not on that account be reportable. People may also say offensive things in the workplace. Distasteful, even offensive, speech is unfortunate but it is often a "necessary side effect[] of the broader enduring values" that the First Amendment protects. Cohen v. California, 403 U.S. 15, 25 (1971). The premise of the First Amendment is that we as a people not leap quickly to suppression, see Texas v. Johnson, 491 U.S. 397, 414 (1989), which may well occur if reportage and punishment for mere speech is an omnipresent possibility.

The remarks alleged here reached the point of abusiveness accompanied by threatening and intimidating body language. Clubb approached so closely that Boyer-Liberto "could feel her breath" and the shouting caused Clubb to "spit on [her] face." J.A. 241.

Actions are one thing. The greater danger lies in predicating liability on remarks. Not here, because Clubb's language, to say the very least, played "no essential part [in] any exposition of ideas." Chaplinksy v. New Hampshire, 315 U.S. 568, 572 (1942). But there will be many instances of uncomfortable workplace speech that cannot on that basis be deemed actionably hostile. It has always been the case that "[t]o justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." Whitney v. California, 274 U.S. 357, 376

61

(1927) (Brandeis, J., concurring) (emphasis added). A central "function of free speech under our system of government is to invite dispute." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949). Unless the "evil" is "imminent . . ., the remedy to be applied is more speech, not enforced silence." Whitney, 274 U.S. at 377 (Brandeis, J., concurring). More speech means insensitive expression in the workplace should be countered and denounced as such. But the bedrock meaning of the First Amendment will be lost if the expression of disfavored or objectionable positions on sensitive and volatile issues become subjects of reportage and sanction. If every co-worker becomes a potential informant, does this environment not in time come to resemble societies other than our own?

Anti-discrimination initiatives need not be at war with free speech. The values protected by the Fourteenth Amendment need not be inconsistent with those safeguarded by the First. Good things happen when people, in this case company employees, talk things out among themselves. Collective discourse and decision-making is a matter the First Amendment holds dear. Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (noting that "the ultimate good desired is better reached by free trade in ideas -- that the best test of truth is the power of the thought to get itself accepted in the competition of the market"). I agree with the majority that

62

"early reporting [is] vital to achieving Title VII's goal of avoiding harm." Maj. Op. at 39. But the majority nowhere acknowledges the dangers of over-reporting. It drifts ever so casually toward draconian consequences for mere utterance and speech. Such blindness to First Amendment values bespeaks a lack of faith in lateral discussions which would no doubt lead nowhere in the case of Clubb and plaintiff, but which may be far preferable to hair-trigger reporting in working out the misunderstandings that occur in every workplace.

Workplaces in their own way are our town squares. John talking to Kathy may prove in the end more fruitful than John running to a higher authority to have Kathy's point-of-view condemned. An objective test, not a subjective standard geared to the most heightened sensibilities, best preserves the balance between free speech and anti-discrimination law. The fact that some incidents, as here, are plainly beyond the pale does not mean we surrender hope in other instances of workers reaching humane understandings in discussions with themselves. Turning someone in as a course of first resort or on insubstantial grounds may perpetuate resentment and bring the prospect of employee dialogue to a premature end.

The law of hostile environments is not anchored in any specific statutory provision. Rather, it was derived from Title VII's general prohibition of discrimination, Meritor Sav. Bank,

FSB v. Vinson, 477 U.S. 57, 64-67 (1986), and kept in proper perspective, it helps prevent companies from becoming intolerable places for racial, ethnic, and other minorities to work. Hostile environment doctrine has also been judicially developed almost in the manner of federal common law. It would be wrong not to infuse this development with one of the greatest of our enumerated constitutional values, that of freedom of speech. Especially when the speech concerns current affairs or other public issues, courts must take notice. See Snyder v. Phelps, 131 S. Ct. 1207, 1215-16 (2011). The framers "believed . . . that public discussion is a political duty." Whitney, 274 U.S. at 375 (Brandeis, J., concurring). Civic health requires that Americans not be fearful of their freedoms, whether in public or private venues, and especially a freedom so precious as the exercise of speech. The majority unfortunately takes less than token recognition of this value. It does not herald for future courts the dangers of taking the American workplace down a more autocratic path.

B.

The objects of civil rights laws are to eliminate discrimination, bring Americans together, and break down barriers. This purpose remains crucial, as Congress has repeatedly attested. And yet our schools are resegregating. Our neighborhoods in all too many instances are very far apart. The

64

workplace may be where racial interactions are most frequent, and it will be sad if law pushes this last remaining venue into the more separatist habits that elsewhere too frequently prevail.

Title VII guards against this. Title VII will be counter-productive, however, if it countenances workplaces over-reliant on employee surveillance and reportage. Such a system erects barriers rather than dismantles them. In an ideal world, the races and sexes would interact spontaneously, in natural and creative ways. There would be no single correct way to behave around, no single correct thing to say to, a worker of another race or gender. We are people -- human beings -- with commonalities far more profound than superficial differences.

The majority surely agrees. Yet by focusing on sick "bigots" who "belittle racial minorities," Maj. Op. at 38 (quoting Jordan v. Alt. Res. Corp., 458 F.3d 332, 353-54 (4th Cir. 2006) (King, J., dissenting)), the majority sells the more generous potential of most Americans short.

Title VII must not contribute an added element of inhibition when we communicate with those of another sex or race. And yet I fear that is precisely what will happen if the objectively reasonable standard is diluted in favor of retaliation protection for any report, however marginal, trivial, or unsubstantiated. The Supreme Court has made clear

that Title VII's "prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace." Oncale, 523 U.S. at 81. But where every ambiguous or unintentionally insensitive remark is going to be reported upstairs, employees naturally will seek to cluster with those who look, act, and think "like themselves." Instead of an interactive community in which individual attributes can be recognized, understood, celebrated, and embraced, the result will be a more fractious and walled-off working environment where noxious stereotypes persist. Keeping interracial distance and maintaining interracial silence will become the safest course, the easiest way to avoid a blot on one's record that comes even with a co-worker's erroneous report. This road is in no one's interest, certainly not ours as a nation or as individuals in the simple search for friends. We must not become others to ourselves.

## III.

The search for balance is important in law, lest the aims of one of America's greatest Acts be compromised by a needlessly censored and suspicious workplace. I believe the majority is right in allowing plaintiff's retaliation claim to proceed, but wrong in not affirming the district court on the merits of the Title VII claim. More than that, I regret that my friends in the

66

majority did not do more to recognize that this is an equation with two sides, an area with more than one dimension. The harmony of balance is nowhere to be found.

NIEMEYER, Circuit Judge, dissenting:

The majority holds that an employee's use of the term "porch monkey" twice in a 24-hour period, when talking to a fellow employee about a single workplace incident, transformed the workplace into a racially hostile environment and thereby effected a discriminatory change in the terms and conditions of the offended employee's employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. It holds further that the offended employee could therefore have had a reasonable belief "that a hostile work environment [was] in progress," ante, at 44 (emphasis added), such that her opposition to the incident justified her retaliation claim against her employer. It reaches these unprecedented conclusions by relying on selected and distilled snippets from Faragher v. City of Boca Raton, 524 U.S. 775 (1998), which, according to the majority, justify the conclusion that "an 'isolated incident' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious,'" ante, at 26 (quoting Faragher, 524 U.S. at 788).

Faragher, however, does not support the majority's reading of it, and the majority's conclusions are otherwise without precedent. First, in the very quotation relied on by the majority, the Faragher Court noted that "isolated incidents" --

68

using the plural -- might, if "extremely serious," satisfy the severity requirement for racial harassment.  524 U.S. at 788. To rationalize its holding, the majority thus reads the plural "incidents" in Faragher to refer only to a "single incident."

Second, and more importantly, the majority fails to note that the portions of Faragher to which it cites were part of the Supreme Court's much lengthier discussion -- and substantively different message -- describing the type of conduct that would not violate Title VII.  In that discussion, the Court drew on several opinions from the courts of appeals and noted, for instance, that the "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII."  Faragher, 524 U.S. at 787 (emphasis added) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 66 (1986) (same).  The Court also cited approvingly to a text on discrimination law which observed, in part, that "a lack of racial sensitivity does not, alone, amount to actionable harassment."  Id. (quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 349 (3d ed. 1996)).  Finally, the Court summarized some of its earlier rulings in the very paragraph relied on by the majority:

So, in Harris [v. Forklift Systems, Inc., 510 U.S. 17 (1993)], we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Most recently, we explained that Title VII does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. A recurring point in these opinions is that simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

Id. at 787-88 (emphasis added) (citations and internal quotation marks omitted).

Without the abridged Faragher snippets, which fail to capture that case's larger message, the majority is left with virtually no support for its holdings and certainly none from the language of Title VII or any Supreme Court decision construing it. Indeed, the Supreme Court has steadfastly maintained that, to be actionable under Title VII, conduct must be so "severe or pervasive" as "to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor, 477 U.S. at 67 (alteration in original) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)) (internal

70

quotation marks omitted). And because hostile work environment claims by their "very nature involve[] repeated conduct," the Court has further recognized -- and the majority acknowledges, see ante, at 26 -- that "a single act of harassment may not be actionable on its own." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Instead, such claims must be "based on the cumulative effect of individual acts." Id.

To be absolutely clear, this case does not present the question of whether an employee should be allowed to call a fellow employee a "porch monkey." Such a racially derogatory and highly offensive term does not belong in the workplace, and I condemn it. Nor does this case present the question of whether an employee, justifiably offended by being called a "porch monkey," should report such an incident to management. Rather, the issues here are substantially narrower.

Framed by principles of well-established law, the first question in this case is whether a reasonable jury could find that an employee's use of the term "porch monkey" twice in a 24-hour period, when talking to a fellow employee about a single incident, could objectively be considered so severe as to transform the workplace into a racially hostile environment, thereby effecting a discriminatory change in the terms and conditions of her employment. And if we were to conclude that a reasonable jury would be unable to make such a finding on the

71

summary judgment record in this case, then the next question would be whether a reasonable jury could find that the offended employee engaged in protected activity when she reported the conduct because she <u>reasonably believed</u> that her employer <u>had committed</u> or <u>was in the process of committing</u> an employment practice that was made unlawful by Title VII.  <u>See</u> 42 U.S.C. § 2000e-3(a).

I respectfully submit that the pertinent law, when applied to the facts in the record, requires a negative response to both questions.  I would therefore affirm the district court's similar conclusions.

I

Reya Boyer-Liberto, an African-American woman, began working at the Clarion Resort Fontainebleau Hotel (the "Clarion") in Ocean City, Maryland, on August 4, 2010.  The Clarion is a typical oceanfront hotel, with several restaurants, bars, a nightclub, and banquet facilities, and it typically employs about 75 people in its Food and Beverage Department.  Liberto started as a morning hostess in the hotel's main restaurant, but she proceeded to work in many of the hotel's other Food and Beverage positions, including serving, bartending, and working banquets.  According to Leonard Berger, the Clarion's owner, Liberto struggled in all of the positions

72

to which she was assigned, and he terminated her employment on September 21, 2010, because she "had failed at four jobs" and "[t]here [were] no more places for her."

During her employment, Liberto interacted with Trudi Clubb, a white woman, who was a longtime employee at the Clarion and a friend of Berger's. Clubb worked part-time as an evening restaurant manager, and she described her responsibilities in that role as "getting things going for the early part of the day, seeing that the crew is well-equipped and ready to present themselves to the customers, getting the tables ready, getting the buffet . . . ready, overseeing all the items that need to be done," and generally helping out as needed. Clubb directly reported to Richard Heubeck, the Clarion's Food and Beverage Director, as well as Mark Elman, the hotel's General Manager. Clubb did not participate in hiring decisions, and there is no indication in the record that she was authorized to fire, demote, or otherwise take tangible employment actions against other members of the Clarion's staff.

In any event, whatever the exact nature of Clubb's role at the Clarion, Liberto testified during her deposition that she never understood Clubb to be a supervisor or even a manager. To be sure, Liberto believed that Clubb, who had worked at the Clarion for close to 20 years and had a longstanding relationship with Berger, had power that she, a brand-new

73

employee, did not have.  But Liberto stated that she reported to Heubeck and to a manager named Jamie Avery, and she was adamant that she never thought of Clubb as her manager.  Instead, her "understanding of . . . Clubb was that she was basically a friend of Dr. Berger's that was there to greet people and just to be a smiling face" -- in other words, that Clubb was merely a "glorified hostess."  Indeed, Liberto stated that she was "told by everyone" that she should just "humor" Clubb and that Avery specifically told her "not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions."  She explained that, although she listened to Clubb, she did so only to the extent that she had "to be respectful and listen to everyone [she] work[ed] with."  And while Clubb would occasionally ask Liberto or other employees to do tasks, Liberto testified that "it was not a regular routine . . . [for Clubb to] instruct[]" other employees and that Clubb did not correct her work.

Liberto testified that, soon after she had started working at the Clarion, she felt as though Clubb had "singled [her] out" and had threatened to take advantage of her personal relationship with Berger to make trouble for Liberto.  But the incident central to this action occurred more than a month after Liberto had been hired.

Late on the night of September 14, Liberto was serving drinks when a customer ordered a "Hula Hula," a cocktail that was particularly time-consuming to make. When the bartender at the restaurant's primary bar refused to make the drink, Liberto walked around to the Clarion's "pub bar" to order the drink there. Once the drink was ready, Liberto passed through the kitchen on her way back to the dining room, even though that was a much longer route, so as to avoid the primary bartender who refused to make the "Hula Hula." As she did so, Clubb yelled out to Liberto that she was not supposed to cut through the kitchen, but Liberto did not hear Clubb. Clubb then approached Liberto as she was preparing the customer's check, yelling at Liberto for ignoring her and calling Liberto "deaf." Liberto said that the distance between the two was close enough that she could "feel [Clubb's] breath" and that spittle from Clubb's mouth was hitting her. Liberto shook her head and said "okay," but largely went about her work, which made Clubb more agitated. As the episode concluded and Clubb was walking away, Clubb said that she was "going to make [Liberto] sorry" and called Liberto either a "damn or dang, porch monkey."

At the beginning of her shift on September 15, Liberto went to Heubeck's office to complain about Clubb's conduct. During the meeting, Clubb came in and said to Liberto, "I need to speak to you, little girl." Liberto told Clubb that she was currently

75

speaking with Heubeck, but Clubb responded that she was "more important."  Liberto and Clubb then sat down at a table outside Heubeck's office, and Clubb scolded Liberto for "abandoning [her] station" the previous night.  As this meeting broke up, Clubb said that "she was going to go to Dr. Berger" and "teach [Liberto] a lesson."  Using a raised voice, Clubb again called Liberto a "porch monkey."

A couple of days later, on September 17, 2010, Liberto spoke by telephone with Nancy Berghauer, the Clarion's Human Resources Director, regarding Clubb.  Berghauer made typewritten notes of the conversation and forwarded them to Berger and Elman.  The next day, September 18, Elman met with Liberto to discuss the situation and to ensure that Berghauer's notes were accurate.  That same day, Heubeck met with Clubb to discuss the incident, and Clubb denied Liberto's allegations.  Heubeck nonetheless issued Clubb a written warning.

When, on September 17, Berger learned about the conflict between Clubb and Liberto, he asked Heubeck to update him on "exactly what was going on," and he also asked about Liberto's job performance.  Heubeck reported that Liberto had so far performed poorly in every job to which she had been assigned.  The next afternoon, Berger met with Elman to review Liberto's work file and discovered that Liberto had failed the Clarion's bartending test "miserably."  When Berger indicated that he

thought the Clarion should terminate Liberto's employment, Elman and Berghauer indicated that doing so "could create a situation" because of Liberto's complaint. Berger replied that "there's not going to be any good time to let her go. The situation will be there." After further consulting Heubeck, Berger made the final decision to terminate Liberto's employment, and Liberto was notified of the decision on September 21. Clubb was not involved in the decision, only learning of it a week later. Berger acknowledged in his deposition that Liberto's complaint prompted him to take a look at her record, but he asserted that his decision to fire her "had nothing to do with her complaint" and was instead based solely on her poor performance.

Liberto filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 23, 2010, alleging discrimination based on her race and retaliation based on her engagement in protected activity, in violation of Title VII. The EEOC issued Liberto a Notice of Right to Sue, following which Liberto commenced this action.

In her complaint, Liberto asserted four claims for relief: two counts of racial discrimination by virtue of a hostile work environment, in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count III), and two counts of retaliation, also in violation of Title VII (Count II) and § 1981 (Count IV). Liberto filed her Title VII claims against only the

77

Fontainebleau Corporation, trading as the Clarion Resort Fontainebleau Hotel, but named both the Fontainebleau Corporation and Berger as defendants in her § 1981 claims.

Following discovery, the defendants filed a motion for summary judgment. Taking Liberto's deposition testimony as true, the district court held that the offensive conduct was too isolated to support Liberto's claims for discrimination and retaliation. Accordingly, by order dated April 4, 2013, the court entered judgment in favor of the defendants. This appeal followed.

II

In holding that the district court erred by entering summary judgment for the defendants on Liberto's hostile work environment claims, the majority extends Title VII liability beyond the statute's textual scope and beyond what the Supreme Court has recognized in construing the statute.

The governing principles are well established. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "This provision obviously prohibits discrimination with respect to employment

78

decisions that have direct economic consequences, such as termination, demotion, and pay cuts." Vance v. Ball State Univ., 133 S. Ct. 2434, 2440 (2013). Since 1986, however, the Supreme Court has recognized that this provision "not only covers 'terms' and 'conditions' in the narrow contractual sense," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998), but also forbids the "practice of creating a working environment heavily charged with . . . discrimination," Meritor, 477 U.S. at 66 (quoting Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21 (1993) ("The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment" (citation and some internal quotation marks omitted)). But in order to ensure that a cause of action based on an alleged hostile work environment is justified by the statute's text, the Supreme Court has emphasized time and time again that the underlying harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment.'" Faragher, 524 U.S. at 786 (alteration in original) (emphasis added) (quoting Meritor, 477 U.S. at 67); see also, e.g., Vance, 133 S. Ct. at 2441 ("In [hostile work environment] cases, we have held, the plaintiff must show that the work environment was so pervaded by

79

discrimination that the terms and conditions of employment were altered"); <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 752 (1998) (recognizing that only harassing conduct that is "severe or pervasive" can effect a "constructive alteration[] in the terms or conditions of employment" and thus become "cognizable under Title VII"); <u>Oncale</u>, 523 U.S. at 81 (emphasizing that Title VII's "prohibition of harassment . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"); <u>Harris</u>, 510 U.S. at 21 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated" (citations and internal quotation marks omitted)).

This demanding standard thus requires more than "conduct that is merely offensive." <u>Harris</u>, 510 U.S. at 21; <u>see also</u> <u>Oncale</u>, 523 U.S. at 80 (noting that Title VII will not become "a general civility code for the American workplace" so long as courts pay "careful attention to the requirements of the statute"). Indeed, the Supreme Court has specifically recognized that the "'<u>mere utterance of an ethnic or racial</u> <u>epithet</u> which engenders offensive feelings in an employee' <u>would</u> <u>not affect the conditions of employment to [a] sufficiently</u> <u>significant degree to violate Title VII</u>." <u>Meritor</u>, 477 U.S.

80

at 67 (emphasis added) (quoting Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21. Similarly, the Court has stressed that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (citation and some internal quotation marks omitted). It should thus come as no surprise that the Court has described the "very nature" of a hostile work environment claim as "involv[ing] repeated conduct." Morgan, 536 U.S. at 115; see also id. ("The 'unlawful employment practice' [at issue in a hostile work environment claim] . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts." (Citation omitted)).

Finally, the Court has emphasized that the impact of offensive workplace conduct on an employee's work environment cannot be "measured in isolation." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam). Instead, courts must determine "whether an environment is sufficiently hostile or abusive [to support a claim] by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or

81

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 524 U.S. at 787-88 (quoting Harris, 510 U.S. at 23).

Under these controlling principles, Clubb's alleged use of the term "porch monkey" twice in less than 24 hours when talking about a single incident was, as a matter of law, not so severe or pervasive as to produce a racially hostile work environment that changed the terms and conditions of Liberto's employment.

There is no suggestion by the majority that the alleged harassment was sufficiently pervasive to qualify -- nor could there be. As such, this case falls outside the heartland of hostile work environment claims, the "very nature [of which] involves repeated conduct." Morgan, 536 U.S. at 115. Instead, the only question at this juncture is whether a jury that believed Liberto's description of events could find that Clubb's conduct was so severe that it altered the terms and conditions of Liberto's employment by creating a work atmosphere that was objectively racially hostile. The answer is plainly no. To be sure, the term "porch monkey" is an odious racial epithet, and any reasonable person in Liberto's position would of course be offended by its use. But the "'mere utterance of an ethnic or racial epithet,'" which offends an employee, does not "affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." Meritor, 477 U.S. at 67 (quoting

82

Rogers, 454 F.2d at 238); see also Harris, 510 U.S. at 21. In short, Liberto has not presented evidence from which a reasonable jury could find that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (citation omitted) (quoting Meritor, 477 U.S. at 65, 67).

The majority's conclusion to the contrary rests on two distortions, one factual and one legal. First, the majority brazenly distorts the facts contained in the summary judgment record regarding Liberto's understanding of Clubb's role at the Clarion. The majority begins by stating that the current record does not establish "whether Clubb was actually Liberto's supervisor or simply her co-worker." Ante, at 30 (emphasis added). But nonetheless it then proceeds to "deem Clubb to have been Liberto's supervisor" for the purpose of "gauging the severity of Clubb's conduct," ante, at 32, on the theory that Clubb portrayed herself as having the ability to get Liberto fired by taking advantage of her friendship with Berger. From this, the majority goes yet further and presumes that Liberto must have believed that Clubb was effectively her supervisor, thus lending a "particularly threatening character" to Clubb's

83

conduct.  <u>Ante</u>, at 32 (quoting <u>Ellerth</u>, 524 U.S. at 763) (internal quotation marks omitted).

There are, however, two significant problems with the majority's approach.  First, it is highly doubtful that Clubb, who may have wielded influence on the Clarion's owner as a result of a personal relationship but who lacked direct authority to take tangible employment actions or even to recommend formally that such actions be taken, would qualify as Liberto's supervisor.  Indeed, the Supreme Court recently clarified what makes an employee a "supervisor" in the context of hostile work environment claims, holding that the critical consideration is whether "he or she <u>is empowered by the employer to take tangible employment actions against the victim</u>."  <u>Vance</u>, 133 S. Ct. at 2439 (emphasis added).  In so holding, the Court explained that this definition would typically allow an employee's supervisory status to be "readily determined, generally by written documentation."  <u>Id.</u> at 2443; <u>see also</u> <u>id.</u> at 2449 ("The interpretation of the concept of a supervisor that we adopt today is one that can be readily applied").  The Court indicated that employees can still qualify as supervisors even if their "decisions [are] subject to approval by higher management."  <u>Id.</u> at 2446 n.8.  It similarly noted that if the individuals vested with decisionmaking power "have a limited ability to exercise independent discretion when making

84

decisions" and must instead "rely on [the recommendations of] other workers who actually interact with the affected employee" then "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations [the individual formally vested with decisionmaking authority] relies." Id. at 2452. But both of those situations are a far cry from an employee whose only influence comes from having the ear of the company's owner because of their personal friendship.

Moreover, even setting that issue aside, the majority's assumption that Liberto must have perceived Clubb as her supervisor flies in the face of Liberto's own deposition testimony about her understanding of Clubb's place in the Clarion's hierarchy. When asked about her understanding of Clubb's role, Liberto responded, "My understanding of Trud[i] Clubb was that she was basically a friend of Dr. Berger's that was there to greet people and just to be a smiling face." She added, "I was told by everyone, oh, just, you know, humor [Clubb]. . . . [T]hat's pretty much what everyone would say about her." When pressed, she was adamant that she did not understand Clubb to be a manager:

> Q. Isn't it true that you were told that [Clubb] was the restaurant manager?
>
> A. Never.

85

Q.    Is it your -- is it your testimony that you did not know Trud[i] Clubb was the restaurant manager?

A.    Absolutely that is my testimony.

Q.    You never knew throughout your entire employment with the Clarion that she was a manager?

A.    Never.  I reported to Jamie [Avery], and Jamie, as a matter of fact, told me not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions.  I had to report to Jamie or Richard [Heubeck].  And at the time [Clubb] did not hold any management cards or keys as Jamie did.

(Emphasis added).  And when asked whether she "thought [she] had to listen to [Clubb]," Liberto's response was just that she "ha[d] to be respectful and listen to everyone [she] work[ed] with."*

The majority's conclusion that we should "deem Clubb to have been Liberto's supervisor" for the purpose of "gauging the severity of Clubb's conduct" simply cannot be reconciled with this testimony.  To the contrary, Liberto's understanding of

---

*    In support of its dubious contention that Liberto perceived Clubb to be in a position to have her employment terminated, the majority points to a September 18, 2010 email from Elman to Heubeck and Berghauer in which Elman recounted his meeting earlier that day with Liberto.  See ante, at 10.  Elman wrote that he had informed Liberto that Clubb was her "boss." But as the majority itself acknowledges, at this stage of the case, we must accept the version of events Liberto recited in her deposition testimony.  See ante, at 4 n.1.  And Liberto's testimony contradicts Elman's apparent understanding of Clubb's relationship to Liberto.  Moreover, in light of the adamancy with which Liberto testified that she "never" understood Clubb to be a manager, we should not use Elman's email to refute Liberto's clearly stated understanding.

86

Clubb as a "glorified hostess" who everyone "humor[ed]" substantially lessens the impact that Clubb's isolated statements could have had on Liberto's work environment. See ante, at 27 ("[A] supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals" (second alteration in original) (quoting Rodgers v. Wis. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)) (internal quotation marks omitted).

In addition to relying on a blatant mischaracterization of Liberto's understanding of Clubb's role at the Clarion, the majority's conclusion that Liberto's hostile work environment claims should reach a jury also rests on a faulty interpretation of a handful of words from the Supreme Court. Specifically, the majority places a great deal of emphasis on the Court's observation in Faragher that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" 524 U.S. at 788 (emphasis added) (citation and some internal quotation marks omitted). Indeed, the majority's holding, distilled to its essence, rests entirely on its conclusion that this is "the type of case contemplated in Faragher where the harassment, though perhaps 'isolated,' can properly be deemed to be 'extremely serious.'" Ante, at 34.

But in Faragher, the Supreme Court referred to "incidents," 524 U.S. at 788, not to a single incident. And five years later, the Court in Morgan confirmed that "repeated conduct" is the stuff of a hostile work environment. 536 U.S. at 115 (emphasis added). Moreover, while the Faragher Court did not elaborate on what it envisioned as the kind of extremely serious isolated incidents that may produce a hostile work environment, we know from Meritor and Harris that such incidents cannot be the "mere utterance of an ethnic or racial epithet." Meritor, 477 U.S. at 67 (quoting Rogers, 454 F.2d at 238) (internal quotation marks omitted). As the Court has made clear, the making of such a statement in the workplace, although highly offensive, "does not sufficiently affect the conditions of employment to implicate Title VII." Harris, 510 U.S. at 21. It is true that Clubb's alleged conduct was reprehensible. But it involved no physical assault or threat of physical harm. Cf. 3 Lex K. Larson, Employment Discrimination § 46.05[3][b], at 46-82 (2d ed. 2012) (noting that "a single incident of physical assault against a co-worker that is motivated by [discriminatory] animus can qualify as severe enough to constitute an alteration of the co-worker's conditions of employment"). Moreover, even though the first encounter took place in a crowded dining room, it appears that no one heard Clubb direct the epithet at Liberto on either occasion,

88

indicating that the name-calling was not publicly humiliating. And again, Liberto thought that she was being upbraided by a co-worker, not her supervisor. Taken together, these considerations show that, as a matter of law, Clubb's alleged conduct did not amount to the "extremely serious" "isolated incidents" that the Faragher Court envisioned as being capable of effecting a "discriminatory change[] in the 'terms and conditions of [the plaintiff's] employment.'" 524 U.S. at 788.

The majority acknowledges that this case marks the first time that our court has concluded that a reasonable jury could find the presence of a hostile work environment based on what was, at most, two repeated statements relating to a single incident. See ante, at 34. What the majority does not acknowledge, however, is that today's decision makes our court an outlier among the other courts of appeals. And instead of being straightforward about that fact, the majority attempts to bolster its conclusion with citations to the Eleventh Circuit's decision in Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240 (11th Cir. 2014), and the D.C. Circuit's decision in Ayissi-Etoh v. Fannie Mae, 712 F.3d 572 (D.C. Cir. 2013). See ante, at 33-34. But both cases involved conduct more pervasive and/or more severe than that alleged by Liberto here.

In Adams, one of the plaintiffs alleged that his supervisor carved the slur "porch monkeys" into the aluminum of the ship on

which they were working, and the Eleventh Circuit observed that that "isolated act" was "severe."  754 F.3d at 1254.  But the same plaintiff also alleged that he "saw one coworker wear a shirt with a Confederate flag"; that he "regularly saw racist graffiti in the men's restroom"; and that when he reported the racist graffiti, his supervisor responded by saying that "it's always been like that and if [he] didn't like it [he could] quit."  Id. at 1253 (alterations in original) (internal quotation marks omitted).  It was based on the totality of these allegations that the Eleventh Circuit concluded that "the harassment [the plaintiff] experienced was frequent and severe," such that "[a] reasonable jury could find that [his] work environment was objectively hostile."  Id. at 1253-54 (emphasis added).

Similarly, the harassment in Ayissi-Etoh was both more pervasive and more severe than the harassment at issue here.  In that case, the plaintiff -- an African-American senior financial modeler -- asked his company's Chief Audit Executive why he had not received a raise in conjunction with a recent promotion.  712 F.3d at 574-75.  In response, the Executive told him, "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money."  Id. at 575 (internal quotation marks omitted).  Several months later, the plaintiff was discussing his work responsibilities

with the company's Vice President of Internal Audit when the meeting "became heated" and the Vice President yelled at him, "Get out of my office nigger." Id. Although the plaintiff missed work and was diagnosed with an anxiety disorder, he was forced to continue working with the Vice President during the ensuing three-month investigation. Id. Based on this evidence, the D.C. Circuit held that the plaintiff was entitled to a jury trial on his hostile work environment claim. These circumstances in Ayissi-Etoh are readily distinguishable from those presented here. First, as the court in Ayissi-Etoh noted, the hostile work environment was precipitated not by a single event, but rather by two independent statements made by two different high-ranking company officials who were both indisputably supervisors of the plaintiff. Id. at 577-78. Those statements ultimately led to psychological problems and directly caused the plaintiff to miss work. Id. at 577. Second, the racist comments were made during conversations about the plaintiff's pay and work assignments, thus increasing the statements' ability to "alter the conditions of the victim's employment." Harris, 510 U.S. at 21. By contrast, in the case at hand, (1) there was only one incident involving one alleged harasser; (2) the alleged harasser was perceived by the plaintiff to be a "glorified hostess" with no "power to . . . make decisions"; and (3) although the alleged harasser denied

91

making the offensive statement, the employer promptly issued her a written reprimand, warning her "to be cautious [that] the language or phrases [that] she uses can not [sic] be perceived as racist or derogatory."

For the reasons given, Clubb's alleged use of the term "porch monkey" twice in less than 24 hours when talking about a single incident was not, as a matter of law, sufficiently severe or pervasive to create a racially hostile work environment that altered the terms and conditions of Liberto's employment. I would therefore affirm the district court's summary judgment on Liberto's Title VII hostile work environment claim.

For the same reasons, I would also affirm the district court's summary judgment on Liberto's hostile work environment claim under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (recognizing that hostile work environment claims under Title VII and § 1981 are governed by the same principles).


                            III

If, as the majority holds, Clubb's twice calling Liberto a "porch monkey" in connection with a single workplace incident was a practice made unlawful by Title VII, it would necessarily follow that Liberto also stated a retaliation claim, for such a claim arises when an employee opposes any practice made an

92

unlawful practice by Title VII and therefore is subjected to an adverse employment action. See ante, at 36. The majority could have ended its retaliation claim analysis without saying more. But it did not. Instead, it gratuitously proceeded to adopt an unprecedented standard for retaliation claims that is much broader than necessary to resolve Liberto's claim. In doing so, it also unnecessarily overruled part of our decision in Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006).

A

As to its new, broad standard for retaliation claims, the majority moves far beyond the scope of any statutory language or any Supreme Court precedent to conclude that, even when an employee opposes a single offensive incident, she has "a reasonable belief that a hostile work environment is occurring" whenever the incident is humiliating. Ante, at 43; see also ante, at 44-45. Applying that standard, the majority concludes that because "'porch monkey' is a racial epithet that is not just humiliating, but 'degrading and humiliating in the extreme,'" Liberto was necessarily opposing a hostile work environment that was "in progress" when she brought the racial slurs to management's attention. Ante, at 45 (quoting Spriggs, 242 F.3d at 185). Undoubtedly, this gratuitous and untenable holding will generate widespread litigation over the many

93

offensive workplace comments made everyday that employees find to be humiliating.

Turning to the statute, as we must, Title VII's antiretaliation provision makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Read most naturally, this provision provides protection from retaliation to an employee who has opposed an employment practice that is actually unlawful under Title VII, including her employer's maintenance of a racially hostile work environment. And reading § 2000e-3(a)'s language generously to give effect to its purpose, we have held that an employee also engages in protected activity when she opposes an employment practice that she reasonably believes to be unlawful, see EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406-07 (4th Cir. 2005), although the Supreme Court has not yet gone so far. Specifically, in Breeden, 532 U.S. at 270, the Court declined "to rule on the propriety of [the Ninth Circuit's] interpretation" of § 2000e-3(a) as "protect[ing] employee 'oppos[ition]' not just to practices that are actually 'made . . . unlawful' by Title VII, but also to practices that the employee could reasonably believe were unlawful," "because even assuming [that its interpretation] is correct, no one could reasonably believe that the incident

94

[at issue] violated Title VII." Finally, we have gone one step further, recognizing that an employee is protected from retaliation if, at the time of her complaint, she had "an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress." Jordan, 458 F.3d at 341 (emphasis added).

Under the Jordan standard, when an employee's complaint relates to another employee's harassing conduct, we do not require the harassment to have already risen to the level actionable under Title VII in order for her opposition activity to be protected from retaliation. But when the offending conduct has not risen to the level of a practice made unlawful by Title VII, we also recognized that it would be inappropriate to "simply assume, without more, that the opposed conduct [would] continue or [would] be repeated unabated." Jordan, 458 F.3d at 341. Instead, we held that in this incipient stage, a plaintiff must be able to point to evidence that "reasonably supports the inference" that the conduct being objected to was "likely to recur at a level sufficient to create a hostile work environment." Id. In other words, for an employee's report of objectionable conduct that has not yet become unlawful under Title VII to qualify as protected activity, the employee must, at the very least, have an objectively reasonable belief that a

hostile work environment would result, "based on circumstances that the employee observes and reasonably believes." Id.

Here, the majority adopts a standard far beyond that which we recognized in Jordan and far beyond what any court of appeals has recognized. It holds that an employee's single complaint about a single incident, regardless of whether the incident is actually unlawful under Title VII or whether the employee reasonably believes that the incident is likely to recur, can be the basis for a legitimate retaliation claim, so long as the conduct is humiliating. See ante, at 43-45. This new standard will surely generate many new questions about which offensive workplace comments are objectively humiliating and lead to an expansion of litigation far beyond Title VII's design.

I would conclude in this case that the district court correctly entered summary judgment for the defendants on Liberto's retaliation claim because, as a matter of law, she did not oppose activity that Title VII protects from retaliation when she reported Clubb's conduct to the Clarion's Human Resources Director. In light of all the circumstances, Clubb's use of an offensive racial epithet twice in less than 24 hours was insufficiently severe to give Liberto an objectively reasonable belief that she was complaining about the presence of a racially hostile work environment, rather than simply about another employee's inappropriate conduct. Certainly, Liberto

96

could have reasonably concluded from Clubb's demeaning statement that Clubb herself was a racist. But the fact that a single employee has revealed herself through an isolated incident to be bigoted does not translate into an objectively reasonable belief that the workplace itself has become abusive to employees because of their race. Cf. Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1214 (11th Cir. 2008) ("[N]ot every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual" (emphasis added) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997)) (internal quotation marks omitted).

Moreover, Clubb's statements were, as a matter of law, too isolated to give Liberto an objectively reasonable belief that the offensive conduct was likely to ripen into a hostile work environment. Liberto has not identified any evidence in the record suggesting that workplace racism was afoot prior to Clubb's statements, nor any evidence suggesting that she had reason to believe that her supervisors and co-workers would tolerate such conduct or permit it to recur. Indeed, after Liberto reported the incident, the Clarion's management promptly issued a written reprimand to Clubb, warning her to be cautious about her language.

97

While Liberto had every right to be offended by Clubb's use of a racial epithet and acted reasonably and responsibly in reporting the incident to Clarion's Human Resources Director, she lacked a reasonable belief, as required by the language of Title VII, that she was opposing her employer's commission of "a[] practice made . . . unlawful . . . by [Title VII]." 42 U.S.C. § 2000e-3(a). For that reason, I would conclude, as a matter of law, that she did not engage in protected activity and that the district court therefore properly entered summary judgment against her on her retaliation claims.

B

In addition to adopting a broad and unprecedented standard for evaluating retaliation claims under Title VII, the majority also gratuitously reverses a portion of <u>Jordan</u> in a manner by which Judge King, the majority's author, explicitly vindicates his dissent in <u>Jordan</u>, notwithstanding his concession that this case presents distinguishing circumstances.

Notably, the majority does not overturn all of <u>Jordan</u>. It in no way suggests, for example, that the isolated incident at issue in that case was sufficiently severe to create a hostile work environment. Indeed, by "oberserv[ing] that the district court improperly analogized this matter . . . to <u>Jordan</u>," the majority instead confirms that "a racist remark that was made by

98

a mere co-worker and not aimed at [the plaintiff] or any other employee" does not amount to a hostile work environment. Ante, at 35. Nor does the majority indicate that the plaintiff in Jordan had a reasonable belief that a hostile work environment was taking shape at the time he reported his co-worker's racist comment to his supervisors. Rather, the only portion of Jordan that the majority overrules is its already liberalizing rule that a plaintiff whose retaliation claim is based on an objectively reasonable belief that a hostile work environment was in progress, but not yet in existence, need only point to some evidence indicating that such an environment was "likely to occur." Jordan, 458 F.3d at 340; see ante, at 38.

The majority claims that this aspect of Jordan "is incompatible with Crawford [v. Metropolitan Government of Nashville & Davidson County, 555 U.S. 271, 279 (2009)], as well as other Supreme Court decisions directing that Title VII's antiretaliation provision be interpreted 'to provide broad protection from retaliation.'" Ante, at 41 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). An analysis of these cases, however, belies the notion that they are in tension with Jordan or that, with these decisions, the Supreme Court has given us license to provide employees with "broad[er] protection from retaliation" than the text of the statute justifies.

For example, Crawford resolved the narrow question of whether "an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation" has opposed an unlawful employment practice within the meaning of Title VII's anti-retaliation provision. 555 U.S. at 273. In holding that such an employee had engaged in protected activity, the Supreme Court's analysis focused on the "ordinary meaning" of the term "oppose," leading the Court to conclude -- as a matter of statutory interpretation -- that "[t]here is . . . no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question." Id. at 276-78. Cleary, nothing in this holding is "incompatible" with Jordan. Ante, at 41.

Similarly, the issue in Burlington Northern was whether "Title VII's antiretaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace," as does the statute's substantive antidiscrimination provision. 548 U.S. at 61. In answering that question in the negative, the Court emphasized that language in the antidiscrimination provision "explicitly

100

limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace," whereas "[n]o such limiting words appear in the antiretaliation provision." Id. at 62. The Court further reasoned that the difference between the two provisions' purposes confirms "that Congress intended the differences that its language suggests." Id. at 63. It was on this basis that the Court rejected the view that it would be "'anomalous' to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination." Id. at 66. As such, despite the majority's suggestion to the contrary, Burlington Northern does not stand for the proposition that courts must always adopt the broadest possible construction of Title VII's antiretaliation provision, and it certainly does not authorize courts to afford plaintiffs protection beyond what the statute itself provides.

At a more general level, the majority faults the Jordan standard as being at odds with "the hope and expectation that employees will report harassment early, before it rises to the level of a hostile work environment." Ante, at 38. Along these lines, the majority suggests that, when combined with the early reporting "compelled by the Ellerth/Faragher defense," Jordan places an employee who has experienced an isolated incident of

harassment in an untenable position, leaving her vulnerable to retaliation if she reports her supervisor's conduct and insulating her employer from liability should she fail to report it. Ante, at 39. The majority's dilemma, however, is a false one. First, the Ellerth/Faragher affirmative defense only enables an employer to avoid vicarious liability for its supervisor's creation of a hostile work environment if the employer can prove both that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765 (emphasis added); see also Faragher, 524 U.S. at 807. It is highly doubtful, however, that an employer would be able to show that an employee acted unreasonably by choosing not to immediately report an isolated incident of workplace misconduct that was not in itself sufficient to give rise to a reasonable belief that a hostile work environment was in progress. Cf. Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir. 2001) (holding that the employer had established the affirmative defense because, "[i]n light of th[e] long-term and persistent harassment, [the plaintiff] cannot be excused from failing to report [her supervisor's conduct]" sooner (emphasis added)). Second, the majority combines the qualitative

102

requirement of objective reasonableness in reporting harassment with the laches concept described by the Supreme Court in Faragher, 524 U.S. at 807, and developed by this court in Matvia, 259 F.3d at 270, in order to invent a fictitious Catch-22. In actuality, an employee only risks retaliation by reporting too early when there is insufficient conduct about which to complain under Title VII, and she only risks dismissal of her claim for reporting too late when she inordinately delays coming forward.

More to the point, however, it is not the role of this court to incentivize the early reporting of objectionable conduct where Congress itself has not seen fit to do so. Indeed, Congress could have written Title VII's antiretaliation provision to provide protection to every employee who reports any offensive, racially or sexually charged workplace incident that makes him or her uncomfortable. But it did not. See, e.g., Breeden, 532 U.S. at 269-71 (holding that an employee did not engage in protected activity when she complained that, during a meeting, her supervisor read aloud a sexually explicit statement, which a job applicant had purportedly made, before looking at her and stating, "I don't know what that means," and then chuckling along with a male employee who offered to explain the comment to him later). Instead, Congress chose to protect only employees who have "opposed any practice made an unlawful

103

employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a). We have already liberally interpreted this provision to protect employees who possess an objectively reasonable belief that they are complaining about a Title VII violation that has occurred or is in progress, a standard that serves to protect employees in close cases.  But we cannot simply presume that a single incident of racially charged workplace misconduct will inevitably ripen into an actual racially hostile work environment, lest our interpretation become completely untethered from Title VII's text.  Instead, a plaintiff whose retaliation claim is based on an objectively reasonable belief that she was opposing a hostile work environment that was in the process of developing must be able to point to some evidence that supports the inference that such an environment was "likely to occur."  Jordan, 458 F.3d at 340 (emphasis added).

Instead of requiring the plaintiff to produce such evidence, the majority concludes that opposing an incident that is humiliating, regardless of whether it could lead to a hostile work environment, is protected.  Ante, at 44-45.  Even a cursory consideration of this new per se rule quickly reveals its problems.  An isolated incident of humiliating harassment is, of course, more serious than "a mere offensive utterance."  Harris, 510 U.S. at 23.  But it is far from clear why a single incident of humiliating harassment that is insufficient to support a

104

reasonable belief that a hostile work environment had come into existence would nonetheless give rise to a reasonable belief that a hostile work environment was in the process of developing. The majority must be assuming that, if a single instance of humiliating harassment has occurred, then objectionable conduct is bound to be repeated at a level sufficient to create a hostile work environment. But this, of course, does not follow. And I can anticipate much hand-wringing in the legal community when determining whether a particular incident qualifies as humiliating or whether it remains merely an offensive utterance.

The majority's position is also entirely pessimistic about the ability and desire of employers to stop the progression from isolated utterances of racial slurs to a hostile work environment. Indeed, the majority manifests a fundamental distrust of employers, assuming that, once a humiliating epithet is uttered, the development of a hostile work environment is a fait accompli -- in other words, that employers are powerless or unwilling to prevent a descent into pervasive hostility. This assumption, of course, finds no more support in Title VII or Supreme Court precedent than it does in basic logic. What is more, even the most conscientious employer will now be reluctant to fire an objectively underperforming employee who has reported a racial epithet that could be considered humiliating because,

105

under the majority's standard, that employee is effectively presumed to have reasonably believed that he was protesting an unlawful employment practice when he made his complaint. This presumption is at odds with Title VII, the Supreme Court's jurisprudence, and the fundamental character of employers in America's modern workplace.

                              IV

At bottom, I would conclude, as did the district court, that while Clubb's comments to Liberto were unacceptably offensive, they were made in connection with an isolated incident, and therefore they were insufficient to demonstrate the existence of a hostile work environment that altered the terms and conditions of Liberto's employment. I would also conclude, as did the district court, that because Title VII's antiretaliation provision requires, as we have liberally construed it, that an employee's opposition must be to a hostile work environment that she reasonably believed was in progress, Liberto's retaliation claims also fail. Thus, I would affirm.